[No. S035769. Aug. 28, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES MATTHEW HEARD, Defendant and Appellant.

948

## COUNSEL

Jonathan P. Milberg, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Susan Sullivan Pithey, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEORGE, C. J.**—A jury found defendant James Matthew Heard guilty of first degree murder (Pen. Code, §§ 187, subd. (a), 189),[1] one count of a forcible lewd act upon a child under the age of 14 years (§ 288, subd. (b)), two counts of anal or genital penetration with a foreign object (§ 289, subd. (a)), and two counts of assault with a deadly weapon causing great bodily injury (§ 245, subd. (a)(1)), all perpetrated against 11-year-old Katrina Brown. The jury further determined the defendant had inflicted great bodily injury in the commission of the sex offenses (§ 12022.8) and had personally inflicted such injury in the commission of the assaults (§ 12022.7). The jury also found true the three special circumstance allegations: that the murder occurred while defendant was engaged in the commission of a lewd and lascivious act upon a child (§ 190.2, subd. (a)(17)), that the murder occurred while defendant was engaged in the commission of vaginal rape by an instrument (§ 190.2, subd. (a)(17)), and that the murder was intentional and involved the infliction of torture (§ 190.2, subd. (a)(18)). At the conclusion of the penalty phase, the jury returned a verdict of death. This appeal is automatic. (Cal. Const., art. VI, § 11; Pen. Code, § 1239, subd. (b).)

As we shall explain, we conclude no reversible error occurred with regard to the judgment of guilt and the special circumstances findings, and we shall affirm the judgment as to these determinations. We conclude, however, that

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

the trial court conducted a seriously deficient examination of a prospective juror during the jury selection process and, in the absence of adequate justification, erroneously excused the juror for cause based upon the juror's ostensible views regarding the death penalty. The controlling decisions of the United States Supreme Court establish that, under federal constitutional principles, this type of error is not subject to harmless-error analysis, but rather must be considered reversible per se with regard to any ensuing death penalty judgment. (See *Gray v. Mississippi* (1987) 481 U.S. 648, 664–666, 668 [95 L.Ed.2d 622, 107 S.Ct. 2045]; *Davis v. Georgia* (1976) 429 U.S. 122, 123 [50 L.Ed.2d 339, 97 S.Ct. 399].) Accordingly, under compulsion of these applicable federal decisions, we shall reverse the judgment as to the sentence of death and remand the matter for a new penalty trial before a properly selected jury.

## I.  FACTS

### A.  *Guilt Phase Evidence*

#### 1.  *The prosecution's case*

Defendant became romantically involved with Marilyn Brown in 1987, experienced an on-again, off-again relationship with her, and then began residing with Marilyn and her daughter, the victim Katrina Brown, in May 1990, about seven months prior to the murder. At that time, defendant also began working as the manager of the apartment complex in which they resided, performing repairs in the other units. From all appearances prior to the murder, Katrina and defendant shared a father-daughter relationship, and there was no evidence he had ever made sexual advances or engaged in any other inappropriate behavior toward her. It is apparent from the testimony and photographic exhibits that, despite her youth, Katrina had a very maturely developed body.

On December 18, 1990, defendant worked in one of the apartments during the morning and afternoon with his friend, Chris Hodges. The two individuals began drinking gin and 40-ounce bottles of malt liquor, and then commenced smoking crack cocaine with a number of other persons into the evening. About 8:00 p.m., defendant announced that he "wanted a woman." He continued consuming alcohol and smoking cocaine, but at approximately 10:00 p.m. angrily complained he had purchased some "bunk" drugs and went out to "beat up" the dealer unless he got his money back.

In the meantime, Katrina prepared for bed and listened to music while Marilyn slept before preparing to leave for work shortly before 3:00 a.m. Marilyn saw defendant sometime between 10:30 and 11:00 p.m., at which

time she did not notice anything unusual about his speech or demeanor. When Marilyn went to work, Katrina was asleep in her bed, the telephone was set by Katrina's closed bedroom door, and all the exterior doors were locked.

At approximately 2:00 a.m., defendant left the apartment and encountered Mattie McAlister, who was on the way to her house nearby, where a birthday party for her was taking place. McAlister noticed that defendant appeared "[b]ombed . . . . He was out of it. . . . He was loaded. . . . He was mad, but he was high. But he was a mad high. . . . He was high, but he wasn't happy. He was mad about something." At the party, McAlister observed defendant drink about three glasses of whisky, continue to smoke cocaine, and become increasingly belligerent. Defendant followed McAlister around the house, continuing to threaten that he was "going to kill a bitch." McAlister told defendant that he frightened her, and she insisted that he leave the premises.

At one point during the party, defendant pushed Cheryl Bailey up against a wall and chastised her for being at a party and drinking alcoholic beverages while pregnant. Bailey's boyfriend, Johnny Joe Robinson, intervened, and defendant responded, "Nigger, you don't know me. I will kill you." In response, Robinson and others drew knives and razors and convinced defendant to retreat. According to Robinson, defendant repeatedly exclaimed, "I ain't going to be satisfied until I kill somebody." Defendant thereafter asked Bailey to leave with him. When she refused, he shoved her and said, "Bitch, I am going to kill you. I am going to kill you."

Defendant departed with Steve Lamar Elkins about 4:00 a.m., stating he wanted to go someplace to "get high." On the street, they encountered Marlo Plump, and defendant demanded money that he said Plump owed him. Elkins attempted to intercede, but defendant angrily turned on him. Elkins returned to McAlister's house and did not see defendant the rest of the night.

Later at the apartment building where defendant resided with Marilyn and Katrina, beginning about 5:00 a.m., Guillermo Garcia and his sister, Lucy Elena, who lived in the upstairs unit, heard the sounds of a man and a young woman fighting; the noise emanated from Marilyn Brown's apartment. The woman screamed and moaned, and made sounds "like a cat crying," and the man told her to "shut up." The sound of the voices continued intermittently for approximately one hour; during the intervals, the Garcias heard the woman crying quietly. Lacking a telephone, the Garcias were unable to call anyone from their apartment. After the fighting sounds stopped, the Garcias fell back asleep. Between 5:30 and 6:00 a.m., Marilyn called home but received no response.

About 7:30 a.m., Katrina's first cousin, Samuel Lee, who lived directly across from the Browns' apartment, came by to pick up Katrina for school.

When he received no response at the front door, he went to the bedroom window and knocked, but no one responded. He returned to the front door, which he found unlatched, and entered. In Katrina's bedroom, he saw her naked body on the floor. He returned to his own apartment and told his Uncle Doyle and his grandfather Charles Lee what he had seen. Charles found Katrina's body sprawled on the floor with a bloody cloth wrapped around her head and two wooden objects between her legs.

Responding to Charles's 911 call, paramedics determined that Katrina was dead, and sheriff's deputies secured the apartment. Katrina's bedroom showed evidence of a struggle, and bloodstained clothing and other items lay around the body. Investigators also found blood, later identified as consistent with both defendant's and Katrina's, on three bedroom walls, the carpeting, and the bathroom floor and sink. In addition to the blood-soaked garment wrapped around Katrina's head, investigators found an empty bottle of rubbing alcohol in her mouth. There were bite marks on her chest area and, according to one of the Sheriff's investigators, a "dusty print on her chest" that appeared to have been "left by some sort of shoe as if someone stomped her in the chest." A baseball bat wrapped with a curtain protruded from her vagina. Another bat, stained with blood and feces, lay between her legs.

Charles Lee told the deputies that defendant lived with Katrina and her mother and gave them a description of him.[2] About that time, William Ardizzone, a Long Beach firefighter paramedic, in response to a call made from a liquor store parking lot, encountered defendant, who had blood dripping from his mouth and covering his face and bare chest. Ardizzone inquired whether defendant had been struck, perhaps with a two-by-four, and defendant responded affirmatively. Examining defendant's mouth, Ardizzone noticed that part of defendant's tongue was missing. The wound did not appear self-inflicted, nor did defendant's chin have any injury.

Ardizzone took defendant to the emergency room at Lakewood Doctors Hospital, where the attending physician, Dr. Max Lebow, determined that approximately one-third of defendant's tongue had been amputated. Defendant, who was spraying blood as he spoke, explained that he had been in a fight and had been struck with an object on his chin, causing defendant to bite off his tongue with his own teeth. Lebow, as well as another emergency room physician, Dr. Robert Flashman, found the injury inconsistent with this description.

An emergency room technician, Michael Murphy, testified that the patient with the severed tongue whom he encountered on the morning of Katrina's

---

[2] Because Charles Lee died during the period between the preliminary hearing and the trial, the testimony he gave at that hearing was read into the record at trial.

murder was "very agitated" and "screaming obscenities."[3] Murphy stated that the patient subsequently refused treatment and requested a transfer to the Veterans Administration (VA) Hospital. When the transfer could not be arranged, the patient "yanked out his [intravenous tube]," "was screaming 'I am getting the fuck out of here,' " and departed from the emergency room against medical advice.[4]

Defendant proceeded to a nearby parking lot, where he attempted to obtain a ride to the VA hospital. When approached by a security guard, defendant was angry and threatening, informing the guard: "Don't fuck with me. I already hurt somebody today. Do you want the same thing?" Defendant challenged the guard to a fight. When confronted by a second guard, defendant warned him to leave defendant alone, stating that otherwise "I will fuck you up, too." This guard recalled that defendant's eyes were glazed and bloodshot. Defendant angrily demanded a ride, confronting several individuals in the parking lot, including one off-duty police officer whom he told, "Motherfucker, I will kill you like-." Defendant stepped back after observing a firearm resting between the officer's legs, and after threatening another security guard who offered assistance, defendant left the parking lot. The off-duty officer used a cellular phone to contact the sheriff's department.

Responding to a disturbance call, sheriff's deputies found defendant at a nearby intersection and initially detained him as a possible robbery suspect. Defendant asserted he had sustained his injury in a fight with street gang members and had been struck on the chin with a two-by-four. The deputies determined he had not been involved in the robbery, and were preparing to release him when they received a radio dispatch regarding a murder suspect named James Heard who fit defendant's physical description. When the deputies asked defendant his name and he identified himself, they arrested him. As he was being placed in the patrol car, he stated, "I didn't mean to do it. I shouldn't have hit so hard."[5]

---

[3] Murphy initially was unable to identify defendant in court as the patient he had encountered. On redirect examination, when the prosecutor showed him photographs taken of defendant shortly after his arrest, Murphy agreed that the photographs resembled the patient he had treated.

[4] Lisa Jones, an emergency room clerk, also was unable to identify defendant in court but did testify that the patient she encountered that morning resembled the individual depicted in the photographs taken of defendant. Jones testified that the patient asked her to contact his "stepdaughter," named "Katrina, . . . [b]ecause he wanted to make sure that she would get to school on time." Clark thereafter contacted a relative whose name defendant provided, and the relative informed Clark that Katrina was dead. By the time Clark related this information to another nurse, defendant had departed from the emergency room.

[5] Blood spatters found on defendant's socks subsequently were determined to be consistent with the blood characteristics of the victim. As noted above, blood spatters found at the crime scene were determined to be consistent with the blood characteristics of defendant.

An autopsy disclosed multiple blunt force injuries, including several severe lacerations, to Katrina's head, which had been tightly wrapped in a housecoat. One laceration was deep enough to expose the bone on her forehead; there were eight to 12 areas of hemorrhaging under the skull. Beatings on the sides and top of her head, described by the coroner as "quite forceful," were sufficient to dislodge Katrina's brain and bruise the brain tissue. On Katrina's breasts, the coroner found bite marks on both nipples and a suction bruise above the left nipple, with a large abrasion between her left breast and her armpit. The abrasion, in conjunction with significant hemorrhaging in the area, was consistent with "repetitive stomping" on this part of the body.

The autopsy further revealed considerable bruising to Katrina's abdominal area, which the coroner opined was caused internally by the repeated thrusting of a baseball bat handle against her large intestine. The injuries also were consistent with repeated stomping on her chest and abdomen. Katrina's entire genital area was extensively damaged, and the internal injuries were considerable. According to the coroner, these injuries were consistent with the thrust of a baseball bat into her vagina with sufficient force to break the wall separating it from the rectum. The coroner also allowed for the possibility that the force came from the thrust of a bat into her anus.

Katrina's mouth showed injuries both from the ingestion of a near-toxic level of rubbing alcohol and from the force of the alcohol bottle being shoved into it. Her body exhibited substantial evidence of forceful manual strangulation, which was most likely the actual, that is immediate, cause of death. Several of the other injuries, however, would have caused death within a matter of hours.

A forensic dentist testified that defendant's teeth were shaped in a manner consistent with the bite marks found on Katrina's breasts.[6] He also expressed the opinion that the injury to defendant's tongue was inconsistent with a self-inflicted wound, but was consistent with the shape of Katrina's teeth.

The coroner opined that defendant may have used the rubbing alcohol, in conjunction with the abdominal stomping, to induce Katrina to regurgitate the severed portion of his tongue.[7]

---

[6] The defense presented some marginal evidence to suggest Chris Hodges was the assailant, but the forensic dentist testified that the shape of Hodges's teeth was inconsistent with these bite marks.

[7] Despite an extensive search performed within the victim's body, the coroner was unable to locate the missing portion of defendant's tongue. A search of the crime scene and surrounding area similarly was unsuccessful.

## 2. *The defense case*

The primary defense theory was that defendant committed the crimes but did so while impaired due to his alcohol and cocaine consumption. This defense rested principally on the testimony of Dr. Orm Aniline, a psychiatrist who specialized in the psychiatric effect of medications and drugs. He explained that when cocaine and alcohol are consumed together, the liver produces cocaethylene, which is more potent and remains in the system longer than cocaine alone. Acute effects of cocaine generally last one-half to one hour depending on tolerance. Based on the results of a test of defendant's urine for the presence of cocaine metabolite, Dr. Aniline concluded defendant either ingested a large dose of cocaine or had accumulated a substantial amount of the drug.

Dr. Aniline explained that the physiological and behavioral effects of large doses of cocaine include unusual mood swings as well as violent and threatening behavior, "hypersexual arousal," and high energy levels. The drug also can impair problem-solving abilities. He found the description of defendant's conduct at Mattie McAlister's party, at the emergency room, and in the parking lot consistent with cocaine intoxication. The intoxication also would explain defendant's attempt to force Katrina to regurgitate the bitten part of his tongue by stomping on her abdomen. Dr. Aniline estimated that defendant's blood-alcohol level was as high as .20 or .30 percent, which also would affect his problem-solving capabilities.

Dr. Aniline further concluded that a person under the influence of cocaethylene might not premeditate or harbor any specific intent to commit a crime, but might act in a "frenzied state."

## 3. *Rebuttal*

The prosecution countered the defense evidence pertaining to cocaethylene by presenting the testimony of Dr. Ronald Markman, a psychiatrist and mental health consultant on drugs and alcohol. Dr. Markman interviewed defendant and reviewed other material related to the case. On that basis, he opined that defendant was acting "in a goal-directed intentional manner and was fully aware of what he was doing" when he committed the murder. Dr. Markman noted in particular defendant's attempt to retrieve his severed tongue and otherwise to conceal his involvement in the crime, even though these attempts were unsuccessful. Because neighbors heard intermittent fighting for approximately an hour, Dr. Markman was of the view that defendant also had the opportunity to reflect on his actions and therefore acted deliberately in continuing the assault.

## B.  PENALTY PHASE EVIDENCE

### 1.  The prosecution's case

The prosecution presented the following evidence in aggravation. In September 1976, while married to Cynthia Wilson, defendant, apparently drunk, fired a rifle inside their home and eventually was taken into police custody. Between 1985 and 1989, defendant lived with Leilani Blake. During that period, he often lost his temper after drinking hard liquor; on two occasions, he punched a hole in the wall of their home. Blake left defendant in August 1989, after he had been drinking and informed her that he wanted "to go out and kick ass" and then repeatedly hit her in the face. As a result of the beating, Blake lost consciousness and suffered facial bruising and swelling, as well as retinal damage that caused her to experience blurred vision for more than one month. The parties also stipulated defendant had pleaded guilty to unlawfully driving and taking a vehicle. (Veh. Code, § 10851, subd. (a).)

### 2.  The defense case

The defense presented extensive evidence of defendant's background. He was born of a White mother and a Black father and was adopted by a Black couple, James and Harriet Heard, at birth. Defendant's adoptive father was an alcoholic who lost his temper easily and was verbally and physically abusive toward defendant. Defendant's adoptive mother also was physically abusive toward defendant; she beat him with the cord of an iron and performed unusual acts on him such as pouring cold water on his penis and subjecting him to unnecessary enemas. The family lived in Seattle, Washington, until defendant was in junior high school, and then moved to Compton, California. As a child, defendant experienced abuse by his parents and harassment from neighborhood children because of his mixed-race background and relatively large size—he weighed 290 pounds in junior high school.

To counter the prosecution's evidence in aggravation, the defense presented testimony that defendant was loving and supportive toward the women he became involved with and their children. However, he suffered from depression, causing him sometimes to disappear for several days, and also abused alcohol and a myriad of other drugs including cocaine.

During the period following defendant's arrest for the present offenses, he adjusted well to incarceration and did not present a problem for correctional personnel. He expressed remorse for his crimes which, the defense argued, were the result of an uncharacteristic "psychotic-like eruption" while he was out of control due to intoxication.

### 3. *Rebuttal*

On rebuttal, the prosecution presented evidence that defendant never had complained of any abuse by his adoptive parents.

## II.  DISCUSSION

### A.  *Jury Selection Issues*

#### 1.  *Excusal of prospective jurors for cause*

Defendant contends that the trial court erroneously excused two prospective jurors, H. and Q., for cause after voir dire concerning their views concerning the death penalty. (See *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1146 [36 Cal.Rptr.2d 235, 885 P.2d 1].)[8]

Past decisions of the United States Supreme Court and this court establish that "[a] prospective juror may be challenged for cause based upon his or her views regarding capital punishment only if those views would ' "prevent or substantially impair" ' the performance of the juror's duties as defined by the court's instructions and the juror's oath. (*Wainwright v. Witt* [, *supra,*] 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844]; *People v. Crittenden* (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Mincey* (1992) 2 Cal.4th 408, 456 [6 Cal.Rptr.2d 822, 827 P.2d 388].) ' " 'A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate.' [Citation.]" [Citation.] In addition, " '[o]n appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous.' [Citations.]" ' [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 975 [108 Cal.Rptr.2d 291, 25 P.3d 519].)

" 'The real question is " ' "whether the juror's views about capital punishment would prevent or impair the juror's ability to return a verdict of death *in the case before the juror.*" ' " ' (*People v. Ochoa* (2001) 26 Cal.4th 398, 431 [110 Cal.Rptr.2d 324, 28 P.3d 78], quoting *People v. Bradford* (1997) 15 Cal.4th 1229, 1318 [65 Cal.Rptr.2d 145, 939 P.2d 259], quoting in

---

[8] We agree with respondent that apart from issues relating to the principles discussed in *Wainwright v. Witt, supra,* 469 U.S. 412, defendant has waived his constitutional claims regarding the exclusion of these two prospective jurors by failing to challenge the trial court's ruling on those grounds at the time the prospective jurors were dismissed. (See *People v. Hines* (1997) 15 Cal.4th 997, 1035 [64 Cal.Rptr.2d 594, 938 P.2d 388].)

turn *People v. Hill* (1992) 3 Cal.4th 959, 1003 [13 Cal.Rptr.2d 475, 839 P.2d 984].) Because the qualification standard operates in the same manner whether a prospective juror's views are for or against the death penalty (*Morgan v. Illinois* (1992) 504 U.S. 719, 726–728 [119 L.Ed.2d 492, 112 S.Ct. 2222]), it is equally true that the 'real question' is whether the juror's views about capital punishment would prevent or impair the juror's ability to return a verdict of life without parole in the case before the juror." (*People v. Cash* (2002) 28 Cal.4th 703, 719–720 [122 Cal.Rptr.2d 545, 50 P.3d 332]; see also *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1005 [30 Cal.Rptr.2d 818, 874 P.2d 248] ["A prospective juror who would *invariably vote either for or against the death penalty* because of one or more circumstances likely to be present in the case being tried, *without regard to the strength of aggravating and mitigating circumstances,* is therefore *subject to challenge for cause,* whether or not the circumstance that would be determinative for that juror has been alleged in the charging document" (italics added)].)

Applying the foregoing standards, we conclude the trial court erred in excusing Prospective Juror H. for cause. As we shall explain, in light of that determination we need not reach the question of the propriety of the excusal of Prospective Juror Q.

### a. *Prospective Juror H.*

Defendant contends the trial court improperly excused Prospective Juror H. for cause. Defendant maintains that the record shows H. was prepared to follow the law and the trial court's instructions, and that the trial court's findings to the contrary are not supported by substantial evidence. In assessing defendant's claim, we set forth in full the relevant portion of the voir dire examination of this potential juror:

"The court: 'Mr. [H.], . . . [a]re you of any position right now where you would automatically vote life without possibility of parole and no matter what evidence showed?'

"Prospective Juror [H.]: 'No.'

"The court: 'Or would you vote death automatically no matter what the evidence showed?'

"Prospective Juror [H.]: 'No.'

"The court: 'Would you characterize yourself as a person who would listen to the evidence and make a decision thereafter?'

"Prospective Juror [H.]: 'Yes.'

"The court: 'Would you be reluctant at all to get to the guilt [*sic*; read penalty] phase by either finding a defendant not guilty of first degree murder or finding the special circumstances not true so as to avoid having to face the issue of the death penalty?'

"Prospective Juror [H.]: 'No.'

"The court: 'Would you decide the case based upon the evidence without fear of having to reach the next stages in deciding this case?'

"Prospective Juror [H.]: 'No.'

"The court: '[I] think I phrased the question badly. [I refer to juror written questionnaire] number 46. It says, "If a defendant is convicted of first degree murder and the special circumstances [are found] to be true, the law provides that the only possible verdicts are death or life without possibility of parole. Overall, which do you think [is] worse for a defendant?" [¶] You have indicated life without possibility of parole. And under explanation of your answer, you said[,] "Perhaps the special circumstances are due to past psychological experiences and I would consider prison." [¶] Assuming there were past psychological experiences, bad childhood or abuse or something else, I don't know whether any of that is going to come out, but assuming that thing occurred, would you be automatically in favor of life without possibility of parole as opposed to the death penalty because of those factors?'

"Prospective Juror [H.]: 'Well, whatever the law states.'

"The court: 'The law is not going to help you a whole lot in weighing the evidence and deciding the penalty. That is, the law is going to give you the two options. And the law is going to tell you that you must consider all the evidence that's in. And then you must look at the aggravating and mitigating factors.'

"Prospective Juror [H.]: 'Uh-huh.'

"The court: 'And you can only impose death if the aggravating factors are so substantial in comparison to the mitigating factors that death is warranted. [¶] Now that's pretty much it. You are going to have to decide for yourself what those factors are and decide wh[ich] penalty is appropriate. So we are not going to tell you how to weigh the psychological factors. We are just not

going to. You are going to have to weigh it yourself in your decisions with the other jurors. You feel comfortable doing that?'

"Prospective Juror [H.]: 'Yes.'

"The court: 'Do you think that if there were past psychological factors that they would weigh heavily enough that you probably wouldn't impose the death penalty? [¶] [Long period of silence.] Is your answer you just don't know or what?'

"Prospective Juror [H.]: 'Yes, I think they might.'

"The court: 'You think they might auger toward life without possibility of parole?'

"Prospective Juror [H.]: 'Yes.'

"The court: 'Are you absolutely committed to that position?'

"Prospective Juror [H.]: 'Yes.'

"The court: 'Are you saying that if there were psychological factors, without naming what they might be, you would automatically vote for life without possibility of parole?'

"Prospective Juror [H.]: 'Without naming them, I don't think so.'

"The court: 'All right. [¶] I am not trying to force anybody into an answer, believe me. I just want to know how you think. As I have told you earlier, if you are irrevocably committed to life without possibility of parole, you can't sit [on the jury in this case]. If the opposite is true, you can't sit. There are a number of reasons for that. I am just trying to find out whether you are going to be in a position to be able to choose or that you feel so strongly about something that you are really not going to consider anything else. That's the intent of my question. That's for all of you, too. [¶] Any questions, [Ms.] Gray?'

"[Defense counsel] Ms. Gray: 'Yes. [¶] Good morning, Mr. [H.]. [¶] On [juror written questionnaire] number 46, and I know his honor has already asked you about this, but you had basically said that you felt that life without possibility of parole is worse than death. [¶] Do you understand now that after hearing his honor's question's that it might not necessarily be so[?] In other words, when you hear bad things about say, a person accused of a crime, those are aggravating factors. And when you hear good things, those

are the mitigating factors. And it's only when the aggravating factors, those are the bad things, so substantially outweigh those mitigating factors, that you give death. If it doesn't so substantially, you give life. [¶] So do you see that death is like the worst of the worst?'

"Prospective Juror [H.]: 'Yeah.'

"Ms. Gray: 'When you look at it, in terms of whether or not the aggravating factors or bad things about the person accused of a crime[, that] is what you look at it to determine life or death?'

"Prospective Juror [H.]: 'Yeah.'

"Ms. Gray: All right. And do you also not understand, and I guess all of you understand that you are going to be given certain things that you can consider in determining or making that choice as to whether to give life or death?'

"Prospective Juror [H.]: 'Yeah.'

"Ms. Gray: 'And one of those things that you can consider is maybe a psychological background. Would you consider that?'

"Prospective Juror [H.]: 'Yeah.'

"Ms. Gray: 'What about whether or not a person has or does not have any prior felony convictions? Would you consider that?'

"The court: 'The court's objection is sustained. He doesn't know what to consider at this point, counsel. I have told him to consider all the evidence. If you ask him whether he should consider prior felony convictions, how does he know whether he can or cannot consider that?'

"Ms. Gray: 'I would preface that question, if the law states that you can.'

"The court: 'No. Court's objection is sustained.'

"Ms. Gray: 'I have nothing further.'

"The court: '[Ms.] Frohreich.'

"[Prosecutor] Ms. Frohreich: 'No questions. Thank you, Mr. [H.].'

[¶] . . . [¶]

[The following colloquy was conducted outside the presence of the prospective jurors.]

"The court: 'First challenge for cause, who wants to go first?'

"Ms. Frohreich: 'I will go first. [¶] Mr. [H.]. Psychiatric problems that I feel makes him, subject to a motion for cause. He admitted to the court that he felt that there were psychological factors in the background that would [lead him to] feel life without possibility of parole was the appropriate sentence. And he indicated when you pressed him, your honor, that he still felt that way, even though you gave him opportunities to back away from that position. [¶] My impression of the record is that he did not back away from that position, and he would not want to impose death if there were—'

"The court: 'I remember what he said.'

"Ms. Gray: 'The circumstances in all of his answers, though, he consistently said that he would consider the factors in all of the evidence as instructed. And he kept emphasizing "whatever the law says and whatever I am told. I don't know the law." [¶] And I think once he gets the instructions, he would be able to follow [the law] because he kept emphasizing he would.'

"The court: 'Okay. . . . [¶] . . . [¶] [Discussion involving another prospective juror.] Mr. [H.][, ] I will excuse for cause. I think that his answers were such that I think he would, given background conditions, vote [for life in prison without possibility of parole]. I think he's although less articulate [than a different prospective juror], in the same sort of a ballpark. So Mr. [H.] is out . . . ."

■ As noted earlier, the applicable law is clear: a prospective juror properly may be excluded for cause based upon his or her views concerning the death penalty only if the juror's views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." (*Wainwright v. Witt, supra,* 469 U.S. at p. 424; *Adams v. Texas* (1980) 448 U.S. 38, 45 [65 L.Ed.2d 581, 100 S.Ct. 2521]; see also *People v. Cash, supra,* 28 Cal.4th at pp. 719–720; *People v. Ochoa* (1998) 19 Cal.4th 353, 443 [79 Cal.Rptr.2d 408, 966 P.2d 442]; *People v. Mincey, supra,* 2 Cal.4th at p. 456; *People v. Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250].) We conclude that the record in this case does not support excusal for cause under the governing standard.

The People initially contend that the trial court's excusal of Prospective Juror H. is supported by the jury questionnaire completed by H. prior to the oral voir dire examination and, in particular, by H.'s response to one question

set forth in the questionnaire (question No. 46), in which H. expressed the view that imprisonment for life without the possibility of parole represents a "worse" punishment than death.

As defendant notes, the jury questionnaire completed by Prospective Juror H. was lost after the trial and is not a part of the record on appeal, and thus we cannot review the particular questionnaire answer to which the trial court referred in the context of H.'s questionnaire responses as a whole, in order to determine whether other responses may shed additional light on the meaning or significance of the particular response to which the trial court referred. In any event, however, it is evident from the transcript of the voir dire quoted above that after the trial court explained to H. that California law considers death the more serious punishment and that the death penalty can be imposed under California law only if the aggravating circumstances outweigh the mitigating circumstances, H. did not provide any indication that his views regarding the death penalty would prevent or significantly impair him from following the controlling California law. Instead the prospective juror stated that he would do "whatever the law states." The record further indicates that this answer to the questionnaire—that life imprisonment without the possibility of parole was considered to be a worse punishment for a defendant than death—was not an uncommon response from the jury venire as a whole, and, indeed, from a substantial number of jurors who actually sat on the case.

In view of H.'s clarification of his views during voir dire, we conclude that his earlier juror questionnaire response, *given without the benefit of the trial court's explanation of the governing legal principles*, does not provide an adequate basis to support H.'s excusal for cause.

Further, we conclude that H.'s responses to the questions posed by the court and counsel on voir dire do not support a determination that his views regarding the death penalty "would prevent or substantially impair the performance of his duties as a juror" so as to justify his excusal for cause under the governing precedent of United States Supreme Court decisions. (See *Wainwright v. Witt, supra,* 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844].) Despite the trial court's imprecise questioning, H. made it quite clear that he would not vote "automatically"—in other words, "no matter what the evidence showed"—either for life imprisonment without the possibility of parole or for death, and also that he would not be reluctant to find the defendant guilty of first degree murder or to find the special circumstances true "so as to avoid having to face the issue of the death penalty." When the court asked whether H. would vote automatically in favor of life imprisonment without the possibility of parole if there was evidence that the defendant had "past psychological experiences, bad childhood or abuse," H. responded, "Well, whatever the law states." When the court then explained that the law

provides "you can only impose death if the aggravating factors are so substantial in comparison to the mitigating factors that death is warranted," but that "[y]ou are going to have to decide for yourself what those factors are and decide [which] penalty is appropriate" and asked whether H. felt comfortable doing that, H. responded that he did. When the court further asked whether "if there were past psychological factors . . . they would weigh heavily enough that you probably wouldn't impose the death penalty," defendant, after a pause, stated "I think they might," but when the court followed up by asking, "Are you saying that if there were psychological factors, without naming what they might be, you would automatically vote for life without possibility of parole?" H. responded, "Without naming them, I don't think so."

Nothing in the foregoing responses supported a finding that H.'s views were such that they would prevent or substantially impair the performance of his duties as a juror. The circumstance that the existence of "psychological factors" might influence H.'s determination whether or not the death penalty would be appropriate in a particular case certainly does not suggest that H. would not properly be exercising the role that California law assigns to jurors in a death penalty case. (See *People v. Jones* (1997) 15 Cal.4th 119, 163, fn. 13 [61 Cal.Rptr.2d 386, 931 P.2d 960], overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673] [recognizing that a challenge for cause "will not lie" in such circumstances].)

In granting the prosecution's motion to excuse Prospective Juror H. for cause, the trial court stated: "I think [H.'s] answers were such that I think he would, given background conditions, vote [for life in prison without possibility of parole]. I think he's although less articulate [than another prospective juror], in the same ballpark. So Mr. [H.] is out . . . ." ■ The trial court's statement does not reveal what the court meant by "background conditions," but in any event the court did not explain what there was in H.'s responses that indicated that he would not be willing or able to follow the law in determining whether life in prison without the possibility of parole, or death, was the appropriate punishment in light of all the evidence presented.

If the trial court remained uncertain as to whether H.'s views concerning the death penalty would impair his ability to follow the law or to otherwise perform his duties as a juror, the court was free, of course, to follow up with additional questions. The prosecutor similarly could have pursued the matter with further questions. Based upon the responses of Prospective Juror H. set forth in the record, however, we conclude that there is not substantial evidence to support a determination that H. harbored views that would prevent or substantially impair the performance of his duties so as to support his excusal for cause. Accordingly, under the applicable standard established

by the controlling decisions of the United States Supreme Court, the trial court's excusal of Prospective Juror H. for cause was error.

■■■■ Furthermore, the governing high court decisions also establish that although such an error does not require reversal of the judgment of guilt or the special circumstance findings, the error does compel the *automatic reversal* of defendant's death sentence, and in that respect the error is not subject to a harmless-error rule, regardless whether the prosecutor may have had remaining peremptory challenges and could have excused Prospective Juror H. (See *Gray v. Mississippi, supra,* 481 U.S. 648, 666–668 [95 L.Ed.2d 622, 107 S.Ct. 2045] (opn. of the court); *id.* at pp. 669–672 (conc. opn. of Powell, J.); *Davis v. Georgia, supra,* 429 U.S. 122, 123; *People v. Ashmus* (1991) 54 Cal.3d 932, 962 [2 Cal.Rptr.2d 112, 820 P.2d 214].) Accordingly, we are compelled by these decisions of the high court to reverse the judgment in the case before us insofar as it relates to the penalty imposed.

Although such precedent clearly requires that we set aside the penalty, we note our dismay regarding the adequacy of the trial court's efforts to fulfill its responsibilities in selecting a jury in this case. Unlike other duties imposed by law upon a trial court that may call for the rendition of quick and difficult decisions under unexpected circumstances in the midst of trial, the conduct of voir dire in a death penalty case is an activity that is particularly susceptible to careful planning and successful completion. In California, numerous resources exist that assist trial courts in conducting voir dire in death penalty trials, and in preventing the type of readily avoidable error that was committed in this case.[9] In view of the extremely serious consequence—an automatic

---

[9] We therefore take this opportunity to remind the state's trial courts of the numerous courses and publications that exist to assist them in properly conducting voir dire in capital cases. These resources include several made available for many years by the California Center for Judicial Education and Research (CJER), a division of the California Administrative Office of the Courts. (See, e.g., in their recent editions, CJER, Death Penalty Trials (2002) pp. 9–18 [case law pertaining to jury selection issues]; *id.,* pp. 66–121 [sample juror questionnaire]; CJER, Death Penalty Benchguide: Pretrial and Guilt Phase (2001) §§ 98.24–98.41, pp. 98-27 to 98-38; CJER, Bench Handbook and Jury Management (2001) Jury Selection, pp. 26–40; see also 5 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) §§ 460–513, pp. 657–731; Murray, Cal. Criminal Law and Procedure Institute, Selected Jury Selection & Management Issues in Criminal Cases (CJER 2003) § 10A, pp. 10–21; Bennett's Guide to Jury Selection and Trial Dynamics: Cal. Criminal Litigation (1995) §§ 18.12–18.14, pp. 527–538.)

The plethora of treatises and handbooks underscores the circumstance that the trial court's mishandling of the voir dire examination of Prospective Juror H. was preventable. Indeed, a review of the foregoing resources provides useful advice which, had it been followed by the trial court in the present case, could have obviated the need for this court's reversal of the penalty phase judgment. (See, e.g., CJER, Bench Handbook and Jury Management, *supra,* p. 31 [the court's voir dire examination should be comprised of questions that "are simply phrased," and the court should "[r]efrain from interrupting the [prospective] jurors during their answers and give them sufficient time to formulate their answers"]; *id.,* p. 39 [the court should ensure "that a complete record be made of why or why not a challenge for cause was

reversal of any ensuing death penalty judgment—that results from a trial court's error in improperly excluding a prospective juror for cause during the death-qualification stage of jury selection, we expect a trial court to make a special effort to be apprised of and to follow the well-established principles and protocols pertaining to the death qualification of a capital jury. As the present case demonstrates, an inadequate or incomplete examination of potential jurors can have disastrous consequences as to the validity of a judgment. The error that occurred in this case—introducing a fatal flaw that tainted the outcome of the penalty phase even before the jury was sworn—underscores the need for trial courts to proceed with special care and clarity in conducting voir dire in death penalty trials. The circumstance that the error in this case was committed by a trial judge with substantial experience in criminal law renders the voir dire examination at issue all the more inexplicable and disappointing.

The colloquy set forth above shows that, in response to a series of awkward questions posited by the trial court, Prospective Juror H. indicated he was prepared to follow the law and had no predisposition one way or the other as to imposition of the death. penalty. Prospective Juror H. generally was clear in his declarations that he would attempt to fulfill his responsibilities as a juror in accordance with the court's instructions and his oath. To the extent H.'s responses were less than definitive, such vagueness reasonably must be viewed as a product of the trial court's own unclear inquiries.[10]

---

granted"]; CJER, Death Penalty Benchguide: Pretrial and Guilt Phase, *supra*, § 98.35, p. 98–35 ["the court should follow up on ambiguous answers"]; *id.*, § 98.37, p. 98–36 ["[a prospective] juror who regards [life imprisonment without possibility of parole] as a worse punishment than death" is not automatically disqualified unless the juror's views "would prevent the juror from 'faithfully and impartially applying the law' "].

[10] We reject the People's contention that the "[l]ong period of silence" noted by the court reporter is supportive of the trial court's excusal of Prospective Juror H. As the transcript reveals, the lengthy period of silence to which the People refer followed a question by the court that asked, "Do you think that if there were past psychological factors that they would weigh heavily enough that you *probably* wouldn't impose the death penalty?" (italics added), and to which the prospective juror ultimately responded, "Yes, I think they *might*." (Italics added.) Reflection at this point was appropriate. The circumstance that unspecified psychological factors "probably" or "might" lead a prospective juror not to impose the death penalty certainly does not provide a basis for excusing the prospective juror for cause. The law permits consideration of such factors. Had he answered in the negative, defendant could have challenged him. Further, when the court followed up by asking, "Are you saying that if there were psychological factors, without naming what they might be, you would automatically vote for life without possibility of parole?" the prospective juror responded, "Without naming them, I don't think so." In our view, the circumstance that Prospective Juror H. took some time to think about and respond to the court's imprecise questioning as to whether he thought that "if there were past psychological factors" he "probably wouldn't impose the death penalty," provides no legitimate basis for concluding that the prospective juror's views would prevent or substantially impair him in performing his duties.

Nor do we believe that additional follow-up questions or observations by the court would have been unduly burdensome: in a capital case that required more than three weeks, the trial court's expenditure of another minute or two in making thoughtful inquiries, followed by a somewhat more thorough explanation of its reasons for excusing or not excusing Prospective Juror H., would have made the difference between rendering a supportable ruling and a reversible one. But given the absence of substantial support in the record for the trial court's ruling, it cannot stand. Although we accord appropriate deference to determinations made by a trial court in the course of jury selection, the trial court in the present case has provided us with virtually nothing of substance to which we might properly defer.[11]

In view of the per se standard of reversal set forth in the United States Supreme Court decisions cited above, the validity of the penalty judgment ultimately rendered against defendant was doomed even before the jury was empaneled. The penalty phase of the trial thus was rendered a complete waste; for naught went the parties' preparation and presentation of their respective penalty phase cases, the court's use of its own resources, and the jurors' performance of their civic duty in deciding the punishment to be imposed.

When a trial court commits such readily avoidable error under the circumstances before us, the public perception of justice suffers and the public fisc is squandered. Now, several years after the original trial commenced, the prosecution and the defense will be asked to prepare and present their respective cases, not only strictly concerning the appropriate penalty but also largely concerning the facts underlying the determination as to guilt in order to sufficiently inform the new jury, thereby consuming scant governmental resources and causing witnesses to relive the details of this horrible crime. That such inefficiencies and renewed anguish were so readily avoidable, and yet were set in motion here by an experienced jurist, thereby compelling this court to reverse a penalty phase judgment in a case so exceptionally aggravated, underscores the need for our trial courts to redouble their efforts to proceed with great care, clarity, and patience in the examination of potential jurors, especially in capital cases.

b. *Prospective Juror Q.*

Prospective Juror Q. initially indicated she would not automatically vote for one punishment or the other in the event of a penalty phase trial. During

[11] In the wake of the trial court's inadequate questioning, one might have expected the prosecutor to more diligently follow up the court's examination of Prospective Juror H. with questions that were more precisely directed toward identifying H.'s qualms, if any, in order to better ensure the validity of the penalty phase judgment that ultimately was rendered. Instead, the prosecutor failed to address a single question to Prospective Juror H.

subsequent voir dire, however, she stated she thought life imprisonment without the possibility of parole was the more serious alternative. Eventually, the court excused Q. for cause.

We need not reach the question whether the trial court properly excused Prospective Juror Q., because defendant's challenge to the excusal of Prospective Juror Q. is based solely upon *Wainwright v. Witt, supra,* 469 U.S. 412, and thus relates only to the penalty phase, and we already have concluded that in view of the trial court's error in dismissing Prospective Juror H. for cause, the penalty phase judgment must be reversed.

### 2. *Missing juror questionnaires*

As already noted, prior to voir dire the prospective jurors completed questionnaires, which included questions relating to their views concerning the death penalty. During jury selection, defense counsel objected that the prosecutor was exercising peremptory challenges in violation of *People v. Wheeler* (1978) 22 Cal.3d 258, 276–277 [148 Cal.Rptr. 890, 583 P.2d 748], and *Batson v. Kentucky* (1986) 476 U.S. 79, 89 [90 L.Ed.2d 69, 106 S.Ct. 1712]. In responding to the trial court's finding of a prima facie showing of impermissible exclusion, the prosecutor referred in part to answers contained in the questionnaires as the basis for exercising peremptory challenges with respect to the prospective jurors at issue. During the process of record correction and certification, however, the trial court determined that all juror questionnaires had been lost except those of the jurors actually empaneled, and further found that it was not possible to reconstruct this aspect of the record for a settled statement. Defendant now contends the loss of the juror questionnaires prejudiced his ability to obtain meaningful appellate review of the trial court's rulings relating to his *Wheeler-Batson* claim.

Unfortunately, this is not the first occasion before us in which juror questionnaires have not been preserved for inclusion in the record on appeal. (See *People v. Ayala* (2000) 24 Cal.4th 243, 269 [99 Cal.Rptr.2d 532, 6 P.3d 193]; *People v. Alvarez* (1996) 14 Cal.4th 155, 196, fn. 8 [58 Cal.Rptr.2d 385, 926 P.2d 365], both capital cases.) ■ We caution that because of the requirement that all such documents be made part of the record in capital cases (see Cal. Rules of Court, rule 39.51 [specifying that "juror questionnaires of all potential jurors" shall be included within the clerk's transcript in capital cases]; see also *id.,* former rule 39.5(c) [generally requiring inclusion of "any other paper or record filed or lodged with the superior court pertaining to the case"]), all juror questionnaires must be scrupulously maintained in such cases. Nevertheless, we find no basis for concluding that the loss of the juror questionnaires requires or warrants reversal of the judgment in this case.

"A criminal defendant is . . . entitled to a record on appeal that is adequate to permit meaningful review. . . . The record on appeal is inadequate, however, only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal. [Citation.] It is the defendant's burden to show prejudice of this sort. [Citation.]" (*People v. Alvarez, supra,* 14 Cal.4th at p. 196, fn. 8.) As in *Alvarez* and *People v. Ayala, supra,* 24 Cal.4th 243, defendant has failed to do so here. In advancing this issue, defendant does not present any substantive objection to the trial court's rejection of his *Wheeler-Batson* claim as to any particular prospective juror, but rather contends that it is impossible, without all the juror questionnaires, to obtain meaningful review of the trial court's *Wheeler-Batson* rulings. He proffers three reasons to support this contention, none of which is meritorious.

First, he asserts that it is impossible to know the race of the excluded prospective jurors because that information was contained in the missing questionnaires and was not made part of the record during jury selection. However, after some discussion concerning which prospective jurors were Black and therefore included in the *Wheeler-Batson* claim, the prosecutor specified those potential jurors she understood were at issue and provided race-neutral explanations for her exercise of peremptory challenges to these jurors. Defense counsel at no time indicated that the excusal of any additional prospective jurors should be addressed. Under these circumstances, defendant may not properly maintain on appeal that the record does not adequately disclose the prospective jurors who were the subject of the *Wheeler-Batson* claim.

Second, defendant notes the prosecutor referred to the questionnaires in responding to the trial court's finding of a prima facie case. Without the actual documents, he implies, it is not possible to obtain adequate review of the justifications put forth by the prosecutor. As with the racial identification information, however, the record contains no contradiction from defense counsel or the court as to the prosecutor's representation of the contents of the juror questionnaires that led her to excuse the prospective jurors in question. ■ Although defense counsel justifiably could assume that the questionnaires ultimately would become part of the record on appeal, this circumstance did not relieve counsel of the obligation to bring to the trial court's attention any disagreement with the prosecutor's representations as to the content of the questionnaires. (Cf. *People v. Vera* (1997) 15 Cal.4th 269, 275–276 [934 P.2d 1279] [as a general rule, the failure to object in trial court waives claim of error on appeal].)

In this regard, "[b]oth *Wheeler* and *Batson* profess confidence in the ability of the trial courts to determine the sufficiency of the prosecutor's showing. In *Wheeler,* we said that we will 'rely on the good judgment of the trial courts

to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.' [Citation.] The court indicated likewise in *Batson*. [Citation.] The trial court, however, must make 'a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily. . . .' [Citation.]" (*People v. Johnson* (1989) 47 Cal.3d 1194, 1216 [255 Cal.Rptr. 569, 767 P.2d 1047].) The record reflects the trial court made such an attempt in passing on the prosecutor's justifications. In the absence of any indication from defense counsel at the time of the trial court's ruling that the prosecutor was misrepresenting the contents of the questionnaires upon which the prosecutor relied, we have no reason to question the trial court's acceptance of the prosecutor's race-neutral explanations as genuine.

Finally, defendant contends the questionnaires are necessary to enable this court to compare the voir dire of those prospective jurors who were excused by the prosecutor in alleged violation of *Wheeler-Batson* with the prosecutor's exercise or nonexercise of peremptory challenges as to other prospective jurors. We recently addressed the subject of employing comparative juror analysis in the *Wheeler-Batson* context. (*People v. Johnson* (2003) 30 Cal.4th 1302, 1318–1325 [1 Cal.Rptr.3d 1, 71 P.3d 270].) After thorough consideration of both our own precedents and federal authority, including *Miller-El v. Cockrell* (2003) 537 U.S. 322 [123 S.Ct. 1029, 154 L.Ed.2d 931], we held in *Johnson* "that engaging in comparative juror analysis *for the first time on appeal* is unreliable and inconsistent with the deference reviewing courts necessarily give to trial courts . . . ." (*Johnson, supra*, 30 Cal.4th at p. 1318.) Although the trial court and the objecting party may rely at trial on comparative juror analysis in evaluating whether a prima facie case has been established and whether the prosecutor's proffered reasons are legitimate and genuine (*id.* at pp. 1324–1325), in the absence of any reliance upon comparative juror analysis in the trial court it is inappropriate for a reviewing court to second-guess *Wheeler-Batson* rulings on that basis. (*Ibid.*; see also *id.* at p. 1331 (dis. opn. of Kennard, J.).) Here, neither the trial court nor defense counsel engaged in any comparative juror analysis at trial, and thus defendant may not raise this claim on appeal.

Accordingly, defendant has failed to demonstrate that he suffered prejudice as the result of the trial court's preservation of only those questionnaires of the individuals who actually were selected to serve as jurors.

## B. *Admission of Photographs*

At a pretrial hearing, the prosecution offered into evidence numerous photographs that depicted the crime scene and the victim's body. The photographs were organized as follows: Exhibit 4 contained 14 photographs of the crime scene, as well as a photograph of Katrina's body, as initially encountered by paramedics and sheriff's deputies; exhibit 5 contained 11 photographs that depicted Katrina's face and head as discovered wrapped in a bloody garment and unwrapped to reveal her wounds; exhibit 6 contained 11 photographs depicting Katrina's head and chest injuries. Defendant objected to the introduction of the photographs on the grounds that the images were irrelevant and, even if relevant, their prejudicial impact outweighed their probative value. (Evid. Code, § 352.) He also contended that certain photographs were cumulative. The trial court rejected defendant's objection and admitted the photographs. On appeal, defendant renews his challenge to these photographs on the grounds asserted below.[12]

As we shall explain, defendant's challenge is without merit.

In reviewing the ruling of the trial court, we reiterate the well-established principle that "the admissibility of this evidence has two components: (1) whether the challenged evidence satisfied the 'relevancy' requirement set forth in Evidence Code section 210, and (2) if the evidence was relevant, whether the trial court abused its discretion under Evidence Code section 352 in finding that the probative value of the [evidence] was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice." (*People v. Scheid* (1997) 16 Cal.4th 1, 13 [65 Cal.Rptr.2d 348, 939 P.2d 748].) We address these issues in turn.

### 1. *The photographs were relevant*

"The rules pertaining to the admissibility of photographic evidence are well-settled. Only relevant evidence is admissible (Evid. Code, § 350; *People* v. *Crittenden*[, *supra*,] 9 Cal.4th 83, 132; *People* v. *Garceau* (1993)

---

[12] At trial, defendant objected to one other item of photographic evidence, exhibit 12, a videotape made by investigators showing the crime scene as they encountered it. The trial court overruled the objection and the jury viewed the tape, which ran approximately five minutes in length. Defendant on appeal does not renew his objection to the videotape.

For the first time on appeal, defendant contends that the trial court's ruling admitting the photographs into evidence violated his state and federal constitutional rights, including his rights to due process and a reliable penalty determination under the Eighth and Fourteenth Amendments. Because defendant failed to interpose an objection on these grounds at trial, this claim was not preserved and may not be raised on appeal. (See *People v. Anderson* (2001) 25 Cal.4th 543, 592, fn. 17 [106 Cal.Rptr.2d 575, 22 P.3d 347]; *People v. Ramos* (1997) 15 Cal.4th 1133, 1170 [64 Cal.Rptr.2d 892, 938 P.2d 950].)

6 Cal.4th 140, 176–177 [24 Cal.Rptr.2d 664, 862 P.2d 664]; *People* v. *Babbitt* (1988) 45 Cal.3d 660, 681 [248 Cal.Rptr. 69, 755 P.2d 253]), and all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute. (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d).) Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' (*People* v. *Garceau, supra,* 6 Cal.4th at p. 177.) The trial court has broad discretion in determining the relevance of evidence (*ibid.; People* v. *Crittenden, supra,* 9 Cal.4th at p. 132; *People* v. *Babbitt, supra,* 45 Cal.3d at p. 681) but lacks discretion to admit irrelevant evidence. (*People* v. *Crittenden, supra,* 9 Cal.4th at p. 132; *People* v. *Burgener* (1986) 41 Cal.3d 505, 527 [224 Cal.Rptr. 112, 714 P.2d 1251].)" (*People. v. Scheid, supra,* 16 Cal.4th 1, 13–14.)

Defendant contends that the photographs "had little or no probative value relating to any issue in this case." He argues that although the issue of his "intent (or lack thereof) at the time the sexual assaults and homicide were committed [was] very much in dispute, none of the photographs had any tendency in reason to prove that these offenses were in any way preplanned or intentional as opposed to being impulsive acts committed in the heat of passion and under the influence of cocaine and alcohol." Defendant adds that the photographs were inadmissible to establish the cause of death or the nature of Katrina's injuries, because he "never contested these points."

The People contend in response that the photographs were relevant to show defendant's mental state on the night of the murder, and that because the prosecution was required to prove premeditation and deliberation, the images were relevant to show the manner in which the crimes were committed. The People maintain that the trial court acted within its discretion in admitting the challenged photographs, and also that the photographs were not cumulative.

As we shall explain, we conclude that the photographs were clearly relevant within the meaning of Evidence Code section 210.

■ First, as the prosecution argued at trial, the photographs were relevant to establish the injuries suffered by Katrina, the savageness of the attack, and the ferocious nature of the struggle. These images illustrated the testimony of various prosecution witnesses who encountered the victim and viewed the crime scene. (See *People v. Scheid, supra,* 16 Cal.4th 1, 15 [photograph was corroborative of witnesses' testimony regarding the circumstances of the crime, and the shocking crime scene encountered; thus, photograph bolstered

the witnesses' credibility]; *People v. Garceau, supra,* 6 Cal.4th 140, 181 [photograph of mummified victims hidden within a dresser was highly probative, because it corroborated testimony relating to concealment of the bodies]; *People v. Pride* (1992) 3 Cal.4th 195, 243 [10 Cal.Rptr.2d 636, 833 P.2d 643] ["the photographs were pertinent because they showed the nature and the placement of the fatal wounds"]; *People v. Allen* (1986) 42 Cal.3d 1222, 1256 [232 Cal.Rptr. 849, 729 P.2d 115] [nine photographs of victims were "clearly relevant" to corroborate witnesses' testimony "concerning the location and manner in which the victims were shot"]; accord, *People v. Taylor* (2001) 26 Cal.4th 1155, 1168 [113 Cal.Rptr.2d 827, 34 P.3d 937]; see also *People v. Hughes* (2002) 27 Cal.4th 287, 335–337 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Sanders* (1990) 51 Cal.3d 471, 514–515 [273 Cal.Rptr. 537, 797 P.2d 561].) The circumstance that defendant did not challenge the prosecution's theory that the attack upon Katrina was a vicious one "does not render victim photographs irrelevant." (*People v. Lewis* (2001) 25 Cal.4th 610, 641 [106 Cal.Rptr.2d 629, 22 P.3d 392].)

Further, the parties vigorously disputed defendant's mental state at the time the crimes were committed. The condition of the victim's body and evidence of defendant's sexual assault therefore were important in establishing the People's case. ■ Thus, for example, the photographs contained in exhibit 4 that depicted the footprint marks found on Katrina's chest and abdomen and the bottle of rubbing alcohol found protruding from her mouth were probative of the prosecution's theory that defendant's capacity to premeditate and deliberate was evidenced by his attempt to force her to regurgitate the amputated portion of his tongue.

Second, the photographs of the crime scene, showing Katrina's body as it was found by paramedics and sheriff's deputies, "was relevant in establishing the fact that a murder had occurred." (*People v. Scheid, supra,* 16 Cal.4th at p. 15; *People v. Taylor, supra,* 26 Cal.4th at p. 1168 [ 113 Cal.Rptr.2d 827, 34 P.3d 937]; *People v. Seaton* (2001) 26 Cal.4th 598, 655 [110 Cal.Rptr.2d 441, 28 P.3d 175].) "The circumstance that other evidence existed to establish the murder did not render the photograph irrelevant for purposes of Evidence Code sections 210 and 350." (*People v. Scheid, supra,* 16 Cal.4th at p. 15.)

■ Third, the photographs were relevant because they established the means by which defendant accomplished the fatal assault. (See *People v. Farnam* (2002) 28 Cal.4th 107, 185 [121 Cal.Rptr.2d 106, 47 P.3d 988] [" 'Generally, photographs that show the manner in which a victim was wounded are relevant to the determination of malice, aggravation and penalty' "]; see also *People v. Lucas* (1995) 12 Cal.4th 415, 450 [48 Cal.Rptr.2d 525, 907 P.2d 373] [photographs admissible to illustrate, among other matters, "intent to kill, deliberation and the torture element of the torture-murder

special circumstance"].) Further, the photographs were probative of the allegations involving the infliction of great bodily injury and torture. In particular, the images contained within exhibit 5 illustrated Katrina's injuries, and some of the photographs were referred to by the coroner during his testimony concerning the fatal blows and strangulation suffered by Katrina. The photographs contained within exhibit 6 depicted the bite marks around Katrina's breasts, which illustrated certain aspects of the forensic dentist's testimony intended to identify the perpetrator.

Although it is true that the prosecution could have relied upon other evidence to establish the matter at issue, "it is immaterial for purposes of determining the relevance of evidence that other evidence may establish the same point." (*People v. Scheid, supra,* 16 Cal.4th 1, 16; see also *People v. Anderson, supra,* 25 Cal.4th 543, 592 ["[P]hotos are not cumulative simply because they illustrate evidence presented by other means"]; *In re Romeo C.* (1995) 33 Cal.App.4th 1838, 1843 [40 Cal.Rptr.2d 85] ["Evidence may be relevant even though it is cumulative; thus, the only ban on cumulative evidence is found in Evidence Code section 352"].) ■ Nor were the photographs somehow rendered irrelevant simply because defendant did not dispute the cause of death or the nature and extent of the victim's injuries. (See *People v. Box* (2000) 23 Cal.4th 1153, 1199 [99 Cal.Rptr.2d 69, 5 P.3d 130]; *People v. Smithey* (1999) 20 Cal.4th 936, 973–974 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) Moreover, "the jury was entitled to see the physical details of the crime scene and the injuries defendant inflicted on his victim[]." (*People v. Weaver* (2001) 26 Cal.4th 876, 933 [111 Cal.Rptr.2d 2, 29 P.3d 103]; see also *People v. Crittenden, supra,* 9 Cal.4th 83, 133; *People v. Pride, supra,* 3 Cal.4th 195, 243.)

In sum, the photographs clearly satisfied the relevancy requirement embodied in Evidence Code section 210. We therefore conclude that the trial court did not err in finding that the photographs constituted relevant evidence.

### 2. *The photographs were not unduly prejudicial*

As noted above, defendant contends that even if the photographs constituted relevant evidence, the trial court nevertheless erred in denying his motion to exclude this evidence pursuant to Evidence Code section 352. Defendant maintains that the photographs were gruesome and likely to inflame the passions of the jury. The People disagree with defendant's characterization and contend the trial court did not abuse its discretion in finding that the probative value of the photographs outweighed any potential prejudice. As we shall explain, we find no abuse of discretion.

"The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or

inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]" (*People v. Crittenden, supra,* 9 Cal.4th at pp. 133–134.)

As noted, the photographs served to illustrate and corroborate the testimony given by various prosecution witnesses regarding the circumstances of the crime. In depicting the crime scene and, more specifically, the wounds suffered by the victim, the photographs illustrated the brutal nature of the attack upon Katrina. "[I]nsofar as defendant is contending that the trial court was required to exclude the photograph[s] under Evidence Code section 352 because th[e] physical evidence was cumulative of the testimonial evidence presented, the trial court correctly rejected defendant's argument. (See *People v. Wilson* (1992) 3 Cal.4th 926, 938 [13 Cal.Rptr.2d 259, 838 P.2d 1212] [' "[W]e have often rejected the argument that photographs of a murder victim should be excluded as cumulative if the facts for which the photographs are offered have been established by testimony." ']; accord, *People v. Kaurish* (1990) 52 Cal.3d 648, 684 [276 Cal.Rptr. 788, 802 P.2d 278]; *People v. Thompson* (1988) 45 Cal.3d 86, 115 [246 Cal.Rptr. 245, 753 P.2d 37].)" (*People v. Scheid, supra,* 16 Cal.4th 1, 19.)

As to whether the photographs had an unduly prejudicial effect, we note that "[w]e have described the 'prejudice' referred to in Evidence Code section 352 as characterizing evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues. (*People v. Garceau, supra,* 6 Cal.4th 140, 178.) As we previously have observed, victim photographs and other graphic items of evidence in murder cases always are disturbing. (*People v. Hendricks* (1987) 43 Cal.3d 584, 594 [238 Cal.Rptr. 66, 737 P.2d 1350].)" (*People v. Crittenden, supra,* 9 Cal.4th at p. 134; accord, *People v. Fierro* (1991) 1 Cal.4th 173, 223 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) Here, the photographs portray the results of defendant's violent conduct; that they are graphic and unpleasant to consider does not render the introduction of those images unduly prejudicial. (See *People v. Navarette* (2003) 30 Cal.4th 458, 496 [133 Cal.Rptr.2d 89, 66 P.3d 1182] [rejecting the defendant's contention that the "sexually suggestive nature" of photographs taken of the victim rendered them unduly prejudicial, and holding that "[w]hen the victim of a murder has been stabbed directly between the breasts and left with her pants and underwear around her ankles, the defendant cannot complain that the jury is exposed to images of her nudity"]; see also *People v. Riel* (2000) 22 Cal.4th 1153, 1194 [96 Cal.Rptr.2d 1, 998 P.2d 969] ["The fact that the exhibits involved blood was due to the crime, not the court's rulings"].)

Our independent review of the photographs and the crime scene videotape introduced at the trial convinces us that, although not easy to look at, they are

not unduly gory or inflammatory. (See, e.g., *People v. McDermott* (2002) 28 Cal.4th 946, 998 [123 Cal.Rptr.2d 654, 51 P.3d 874]; *People v. Michaels* (2002) 28 Cal.4th 436, 531–532 [122 Cal.Rptr.2d 285, 49 P.3d 1032]; *People v. Anderson, supra,* 25 Cal.4th 543, 590–592; *People v. Pride, supra,* 3 Cal.4th 195, 243; *People v. Fierro, supra,* 1 Cal.4th 173, 223; *People v. Kelly* (1990) 51 Cal.3d 931, 963 [275 Cal.Rptr. 160, 800 P.2d 516]; *People v. Turner* (1990) 50 Cal.3d 668, 707 [268 Cal.Rptr. 706, 789 P.2d 887]; *People v. Coleman* (1988) 46 Cal.3d 749, 776 [251 Cal.Rptr. 83, 759 P.2d 1260].) The photographs, while unquestionably unpleasant, do not appear to be of the sort that might inflame a jury. (See, e.g., *People v. Turner* (1984) 37 Cal.3d 302, 320, 321 [208 Cal.Rptr. 196, 690 P.2d 669], and fn. 9, overruled on another ground in *People v. Anderson* (1987) 43 Cal.3d 1104, 1149–1150 [240 Cal.Rptr. 585, 742 P.2d 1306] [upholding trial court's finding that four crime scene photographs, which included a photograph of one victim's head in a large pool of blood and of another victim lying face up with bleeding wounds, were "not gruesome"]; see also *People v. Allen, supra,* 42 Cal.3d 1222, 1258 [victims' bodies were not depicted "in a badly decomposed condition . . . or after they had been grossly disfigured during autopsy"].)[13]

Moreover, as we observed in *People v. Scheid, supra,* 16 Cal.4th 1, 20, "the trial court clearly and properly could find that the photograph[s were] not so gruesome as to have impermissibly swayed the jury *'in light of the testimony detailing each and every fact relating to the crime scene and victims.'* " As noted above, various witnesses for the prosecution testified in detail as to what they observed when they first encountered Katrina's body. (See *People v. Allen, supra,* 42 Cal.3d 1222, 1258 [observing that the inflammatory nature of nine photographs "was relatively slight in comparison with the heinous nature of the crime presented to the jury through the testimony of witnesses"].)

Nor, contrary to defendant's assertion, were the photographs unduly preju-dicial on the ground they were cumulative by reason of their corroboration of

---

[13] The five cases relied upon by defendant are distinguishable and do not persuade us that the trial court erred in admitting into evidence the photographs in question. (See *People v. Poggi* (1988) 45 Cal.3d 306, 322–323 [246 Cal.Rptr. 886, 753 P.2d 1082] [one photograph of victim while alive and another showing an autopsy incision were deemed irrelevant to any disputed material fact]; *People v. Gibson* (1976) 56 Cal.App.3d 119, 134–135 [128 Cal.Rptr. 302] [photographs were deemed to represent "cumulative evidence of slight relevancy"]; *People v. Smith* (1973) 33 Cal.App.3d 51, 68–69 [108 Cal.Rptr. 698] ["the record does not reveal what evidentiary purpose was expressed by the district attorney in presenting these pictures to the jury"], disapproved on other grounds in *People v. Wetmore* (1978) 22 Cal.3d 318, 325 [149 Cal.Rptr. 265, 583 P.2d 1308]; *People v. Burns* (1952) 109 Cal.App.2d 524, 541 [241 P.2d 308] [admitting into evidence postautopsy photographs of uncertain probative value deemed to have been an abuse of discretion].) In a fifth case, also involving an autopsy photograph, this court concluded that the image lacked probative value when introduced at the penalty phase. (*People v. Love* (1960) 53 Cal.2d 843, 856 [3 Cal.Rptr. 665, 350 P.2d 705].)

facts independently established by testimony. (See, e.g., *People v. Hart* (1999) 20 Cal.4th 546, 616 [85 Cal.Rptr.2d 132, 976 P.2d 683] [upholding the trial court's ruling admitting into evidence 16 photographic slides, three photographs, and one videotape]; *People v. Medina* (1995) 11 Cal.4th 694, 754–755 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People v. Price* (1991) 1 Cal.4th 324, 441 [3 Cal.Rptr.2d 106, 821 P.2d 610], and cases cited therein; see also *People v. Thompson, supra*, 45 Cal.3d 86, 115 ["Even somewhat cumulative photographic evidence may be admitted if relevant"].)

Finally, even if the photographs engendered a disturbing response among the jurors, we believe the risk defendant would be prejudiced by that response was minimal, because the jury knew defendant had committed the acts described by the witnesses who had appeared before them.

In sum, we conclude that the trial court reasonably could determine that the probative value of the photographic evidence outweighed its potentially prejudicial effect. We thus determine that the trial court did not abuse its discretion under Evidence Code section 352 in admitting the photographs into evidence. (*People v. Crittenden, supra*, 9 Cal.4th at p. 134; *People v. Wilson, supra*, 3 Cal.4th at p. 938; *People v. Mickey* (1991) 54 Cal.3d 612, 656 [286 Cal.Rptr. 801, 818 P.2d 84]; *People v. Cox* (1991) 53 Cal.3d 618, 666 [280 Cal.Rptr. 692, 809 P.2d 351]; *People v. Benson* (1990) 52 Cal.3d 754, 786 [276 Cal.Rptr. 827, 802 P.2d 330].)

### 3. *Even if the trial court erred, no prejudice occurred*

Even if we were to agree with defendant that the trial court erred in admitting the photographic evidence in question, we nonetheless would conclude that any error in admitting such evidence was harmless under the *Watson* standard. (See *People v. Allen, supra*, 42 Cal.3d 1222, 1258, applying the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

"Under the *Watson* standard, the erroneous admission of a photograph warrants reversal of a conviction only if the appellate court concludes that it is reasonably probable the jury would have reached a different result had the photograph been excluded. (*People v. Watson, supra*, 46 Cal.2d at p. 836.)" (*People v. Scheid, supra*, 16 Cal.4th 1, 21.) The photographs at issue did not disclose to the jury any information that was not presented in detail through the testimony of witnesses. Although the photographs were unpleasant, they were not unusually disturbing or unduly gruesome, and were no more inflammatory than the graphic testimony provided by a number of the prosecution's witnesses. Under these circumstances, we conclude it is not reasonably probable that the admission of the photographs affected the jury's verdict. (*People v. Gurule* (2002) 28 Cal.4th 557, 625 [123 Cal.Rptr.2d 345, 51 P.3d 224]; *People v. Allen, supra*, 42 Cal.3d at p. 1258.)

## C. *Instructional Issues*

### 1. *Reasonable doubt instruction*

Defendant contends the standard reasonable doubt instruction used at his trial—former CALJIC No. 2.90—unconstitutionally permitted the jurors to take into account moral considerations in determining his guilt.[14] As he acknowledges, however, the United States Supreme Court has sustained the language of former CALJIC No. 2.90 against constitutional challenge (*Victor v. Nebraska* (1994) 511 U.S. 1, 6 [127 L.Ed.2d 583, 114 S.Ct. 1239], affg. *People v. Sandoval* (1992) 4 Cal.4th 155, 185–186 [14 Cal.Rptr.2d 342, 841 P.2d 862]) even though the high court expressed concerns regarding the wording of the instruction, and this court consistently has affirmed the validity of the instruction. (*People v. Lewis, supra,* 25 Cal.4th 610, 651–652; *People v. Staten* (2000) 24 Cal.4th 434, 456 [101 Cal.Rptr.2d 213, 11 P.3d 968].) Defendant has not submitted any argument that would undermine these decisions.

### 2. *Circumstantial evidence instruction*

Defendant also raises a constitutional objection to the circumstantial evidence instructions set forth in CALJIC Nos. 2.00 and 2.01,[15] which he contends permit the jury to draw factual inferences "without making the constitutionally required *additional* judgment that the inferred fact was *more*

---

[14] In relevant part, the court instructed defendant's jury that "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as follows: it is not a mere possible doubt; because everything relating to human affairs, and depending upon moral evidence is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all of the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge."

CALJIC No. 2.90 now provides in part: "Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all of the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

[15] Those instructions as given provided as follows: "Evidence is either direct or circumstantial.

"Direct evidence is evidence that directly proves a fact without the necessity of an inference. It is evidence which by itself, if found to be true, establishes a fact.

"Circumstantial evidence is evidence that, if found to be true, proves a fact from which an inference of the existence of another fact may be drawn.

"It is not necessary that facts be proved by direct evidence. They may be proved also by circumstantial evidence or by a combination of direct evidence and circumstantial evidence. Both direct evidence and circumstantial evidence are acceptable means of proof; neither is entitled to any greater weight than the other.

*likely than not* to follow from the proved fact." Thus, he argues, these instructions conflict with the presumption of innocence, the guarantee of due process of law, and the requirement of proof beyond a reasonable doubt.

In response to similar arguments, we previously have concluded that these instructions are not constitutionally defective when viewed as a whole and read in conjunction with the reasonable doubt instruction. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1054 [60 Cal.Rptr.2d 225, 929 P.2d 544]; *People v. Wilson, supra,* 3 Cal.4th 926, 942–943.) Defendant urges us to reconsider this determination in light of his argument that the reasonable doubt instruction is "hopelessly confusing." Because we disagree with this assessment of former CALJIC No. 2.90, we decline to do so.

### 3. *Lesser included offense instructions*

The trial court instructed on first degree premeditated and felony murder and implied-malice second degree murder. Defendant contends it erred in failing additionally to instruct the jury sua sponte on the lesser included offense of involuntary manslaughter, as to which defendant contends the jury properly could have found him guilty, based upon evidence that defendant ingested cocaine and alcohol prior to the sexual assault and murder of Katrina and as a result "was not conscious of what he was doing."

" '[A] defendant has a constitutional right to have the jury determine every material issue presented by the evidence[, and] . . . an erroneous failure to instruct on a lesser included offense constitutes a denial of that right . . . .' [Citations.] To protect this right and the broader interest of safeguarding the jury's function of ascertaining the truth, a trial court must instruct on lesser included offenses, even in the absence of a request, whenever there is substantial evidence raising a question as to whether all of the elements of the

---

"However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only consistent with the theory that the defendant is guilty of a crime, but cannot be reconciled with any other rational conclusion.

"Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt.

"Also, if the circumstantial evidence as to any particular count . . . is susceptible of two reasonable interpretations, one of which points to the defendant's guilt, the other to his innocence, you must adopt that interpretation which points to the defendant's innocence and reject that interpretation which points to his guilt.

"If on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

charged offense are present. [Citations.] 'Substantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' [Citation.]" (*People v. Lewis, supra,* 25 Cal.4th at p. 645.) Involuntary manslaughter ordinarily is considered a lesser included offense of murder. (See *People v. Ochoa, supra,* 19 Cal.4th 353, 422.)

Defendant predicates his argument on the testimony of defense witness Dr. Aniline that he was suffering from cocaethylene syndrome—as a result of the combined effects of cocaine and alcohol—and that "it was reasonably inferable that in his intoxicated state he was unaware of, and thus unable to control, his behavior." Defendant asserts that in view of his prior relationship with the victim, during which he never had made any inappropriate sexual advances toward her, and his protective attitude toward her, "the jury certainly could have found" that he " 'must' have been literally 'out of his mind' and 'unconscious' of what he was doing" when he committed the crimes against her.

Involuntary manslaughter includes criminally negligent homicide. (§ 192, subd. (b); *People v. Ochoa, supra,* 19 Cal.4th 353, 423.) "When a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter." (*Ochoa,* at p. 423.) Although unconsciousness in this context " 'can exist . . . where the subject physically acts in fact but is not, at the time, conscious of acting' " (*People v. Kelly* (1973) 10 Cal.3d 565, 572 [111 Cal.Rptr. 171, 516 P.2d 875]), the record in the present case fails to reflect substantial evidence that defendant's ingestion of cocaine and alcohol rendered him unconscious.

Most significantly, Dr. Aniline did not indicate defendant was unconscious at the time of the attack on Katrina, but rather testified only that defendant's drug consumption may have impaired his judgment and precipitated a "frenzied state" rather than deliberate behavior. Furthermore, other circumstances, including the manner of the killing and defendant's own statements prior to the crimes, are inconsistent with any suggestion that defendant was unconscious when he committed the acts in question. At Mattie McAlister's party, when Cheryl Bailey rebuffed his advances, defendant proclaimed that he was "going to kill a bitch." He then proceeded to the Browns' apartment where he engaged in an hour-long assault, during which time neighbors heard the victim's intermittent screams and crying. Particularly revealing of defendant's state of mind were his efforts to retrieve the amputated piece of his tongue that he apparently believed Katrina had swallowed and to remove fingerprints from the baseball bats. In sum, the evidence failed in all respects to support a finding of unconsciousness, and the trial court did not err in

declining to instruct the jury on involuntary manslaughter. (See *People v. Ochoa, supra,* 19 Cal.4th at p. 424.)

Moreover, the jury was instructed that in order to find defendant guilty of specified sexual offenses, it had to determine that he acted with specific intent, and that it should consider the effect of his intoxication in deciding whether he acted with the requisite mental state. In convicting defendant of these sexual offenses, the jury necessarily determined that defendant formed the requisite specific intent despite his consumption of drugs and alcohol. In view of this finding, the jury could not have concluded he was unconscious and therefore guilty only of involuntary manslaughter. Thus, even if the court had erred in its instructions, we would find that such error was clearly harmless. (See *People v. Earp* (1999) 20 Cal.4th 826, 884–886 [85 Cal.Rptr.2d 857, 978 P.2d 15].)

### D. *Cumulative Error*

Defendant contends that the cumulative effect of the guilt phase errors asserted was sufficient to warrant reversal regardless of the prejudicial impact of any single error. Having determined that no error occurred at the guilt phase, we conclude that this contention lacks merit as well.

### E. *Constitutionality of California's Death Penalty Statutes*

Defendant's contentions pertaining to the penalty phase judgment are limited to a series of challenges to the constitutionality of California's death penalty statutes—arguing in various respects that they violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and article I, section 17, of the California Constitution. Because we have concluded that the erroneous excusal of Prospective Juror H. for cause compels reversal of defendant's death sentence, we need not address these issues.

### III. CONCLUSION

The judgment is affirmed as to the guilt verdicts and the special circumstance findings, but is reversed as to the sentence of death. The case is remanded to the trial court for a new penalty trial before a properly selected jury.

Kennard, J., Werdegar, J., and Moreno, J., concurred.

**BROWN, J.,** Concurring and Dissenting.—I concur in the majority's determination to affirm the jury's guilty verdict and special circumstance findings.

I cannot agree, however, that the trial court erred in excusing Prospective Juror H. for cause. I find the record fairly supports—and thus requires deference to—the court's implicit determination that H.'s views on the death penalty would sufficiently interfere with his duties as a juror to warrant excusal.

In *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844] (*Witt*), the United States Supreme Court reconsidered language in *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], to the effect that prospective jurors may be excused for cause if they make it "unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*." (*Id.* at p. 522, fn. 21.) This standard had tended to be applied in formulaic terms, with "lower courts stat[ing] that a veniremember may be excluded only if he or she would 'automatically' vote against the death penalty, and even then this state of mind must be 'unambiguous,' or 'unmistakably clear.' [Citation.]" (*Witt*, at p. 419.)

In *Witt*, the high court rejected such a narrow and formalistic approach and discarded the *Witherspoon* formulation. It held instead that a trial court may excuse a prospective juror for cause whenever "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Witt, supra,* 469 U.S. at p. 424, fn. omitted.) The court further emphasized that "in addition to dispensing with *Witherspoon*'s reference to 'automatic' decisionmaking, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror." (*Id.* at pp. 424–425, fn. omitted.)

With respect to deference, the court explained: "[T]he question whether a venireman is biased has traditionally been determined through *voir dire* culminating in a finding by the trial judge concerning the venireman's state of

mind. . . . [S]uch a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. Such determinations were entitled to deference even on direct review [as well as federal habeas corpus proceedings]." (*Witt, supra,* 469 U.S. at p. 428, fn. omitted.) While the trial judge applies a legal standard in resolving challenges for cause, "his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record." (*Id.* at p. 429; see also *Darden v. Wainwright* (1986) 477 U.S. 168, 175–178 [91 L.Ed.2d 144, 106 S.Ct. 2464]; *Patton v. Yount* (1984) 467 U.S. 1025, 1038 [81 L.Ed.2d 847, 104 S.Ct. 2885].) Indeed, as the court had observed as early as *Reynolds v. United States* (1878) 98 U.S. 145, 156–157 [25 L.Ed. 244], " '[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record. Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon such a question of fact, except in a clear case.' " (*Witt, supra,* at p. 428, fn. 9, quoting *Reynolds,* at pp. 156–157.)

In applying the constitutional standard of *Witt,* this court has also consistently accorded the same measure of deference in reviewing excusals for cause. (See, e.g., *People v. Crittenden* (1994) 9 Cal.4th 83, 122–123 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Ghent* (1987) 43 Cal.3d 739, 768 [239 Cal.Rptr. 82, 739 P.2d 1250].) "On appeal, we will uphold a trial court's ruling on a challenge for cause by either party 'if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous.' [Citations.]" (*People v. Bolden* (2002) 29 Cal.4th 515, 537 [127 Cal.Rptr.2d 802, 58 P.3d 931].)

Reviewing the record in light of the foregoing principles, I conclude the trial court did not err in excusing Prospective Juror H. for cause. In making its ruling, the court focused on H.'s views regarding "background conditions." During voir dire, the court noted that H. had referred in his juror questionnaire to "past psychological experiences" as a basis for imposing life without possibility of parole—which H. considered the more serious punishment—and sought to clarify his views. The following colloquy then ensued:

"THE COURT: . . . Assuming there were past psychological experiences, bad childhood or abuse or something else, I don't know whether any of that is going to come out, but assuming that thing occurred, would you be automatically in favor of life without possibility of parole as opposed to the death penalty because of those factors?

"PROSPECTIVE JUROR [H.]: Well, whatever the law states.

"THE COURT: The law is not going to help you a whole lot in weighing the evidence and deciding the penalty. That is, the law is going to give you the two options. And the law is going to tell you that you must consider all the evidence that's in. And then you must look at the aggravating and mitigating factors.

"PROSPECTIVE JUROR [H.]: Uh-huh.

"THE COURT: And you can only impose death if the aggravating factors are so substantial in comparison to the mitigating factors that death is warranted.

"Now that's pretty much it. You are going to have to decide for yourself what those factors are and decide what penalty is appropriate. So we are not going to tell you how to weigh the psychological factors. We are just not going to. You are going to have to weigh it yourself in your decisions with the other jurors. You feel comfortable doing that?

"PROSPECTIVE JUROR [H.]: Yes.

"THE COURT: Do you think that if there were past psychological factors that they would weigh heavily enough that you probably wouldn't impose the death penalty?

"[Long period of silence.] Is your answer you just don't know or what?

"PROSPECTIVE JUROR [H.]: Yes, I think they might.

"THE COURT: You think they might auger toward life without possibility of parole?

"PROSPECTIVE JUROR [H.]: Yes.

"THE COURT: Are you absolutely committed to that position?

"PROSPECTIVE JUROR [H.]: Yes.

"THE COURT: You are saying that if there were psychological factors, without naming what they might be, you would automatically vote for life without possibility of parole?

"PROSPECTIVE JUROR [H.]: Without naming them, I don't think so."

It thus appears that although H. initially indicated he felt "comfortable" with deliberating the question of penalty, including consideration of psychological factors, the trial court nevertheless perceived a sufficient degree of ambiguity or uncertainty to persist in this line of questioning to clarify his true state of mind. The court also felt constrained to note a long period of silence—during which it plainly would have been focused on H.'s demeanor—before H. responded regarding imposition of the death penalty "if there were past psychological factors." Despite several more questions, however, he never expressed a clear position. Whether or not his answers were actually inconsistent, they were at least equivocal.

"[A] primary purpose of [the death-qualifying] phase of voir dire is to enable the trial court to 'assess the juror's state of mind' and thereby make a meaningful evaluation of his or her impartiality. [Citation.] [¶] As a concomitant principle of review, we generally accord considerable deference to these evaluations, which 'constitute[] a resolution of what is essentially a question of fact or, perhaps more accurately, a mixed question that is essentially factual. [Citation.]' [Citation.] 'If there are conflicting answers to the voir dire, the court may assess the juror's state of mind and is not bound by statements which, taken in isolation, are unequivocal. When such a prospective juror has both equivocated and taken (at some point) a clear stand, the wisdom of entrusting the ruling on the challenge for cause to the trial court becomes clear.' [Citation.] Thus, 'where equivocal or conflicting responses are elicited regarding a prospective juror's ability to impose the death penalty, the trial court's determination as to his true state of mind is binding on an appellate court.' [Citations.] 'In the final analysis, "the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record," and ambiguities are to be resolved in favor of the trial court's assessment. [Citation.]' [Citations.]" (*People v. Cox* (1991) 53 Cal.3d 618, 646–647 [280 Cal.Rptr. 692, 809 P.2d 351].) The portion of the voir dire cited above reflects precisely the circumstance in which we should defer to the conclusions of the trial court, which saw and heard what we can now only review in inscrutable print.

The majority describes the voir dire as "a series of awkward questions" and suggests the court's perceived deficiencies in H.'s responses "reasonably must be viewed as a product of the trial court's own unclear inquiries." (Maj. opn., *ante*, at p. 967, fn. omitted.) With all due respect, these criticisms not only unfairly disparage a conscientious bench officer[1] but highlight the

---

[1] The majority's characterization of Prospective Juror H.'s voir dire variously as inadequate and "inexplicable and disappointing" (maj. opn., *ante*, at p. 967) is equally unjustified on this record. A review of H.'s questioning in the context of the entire voir dire demonstrates that the court considered each prospective juror, including H., individually to the extent necessary, or

majority's own failure to impose the self-restraint required of a reviewing court in these circumstances. As the high court in *Witt* cautioned, this is the very situation in which our "common sense should have realized [what] experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror." (*Witt*, *supra*, 469 U.S. at pp. 424–426; see *id.* at pp. 428, fn. 9, 429.) This court did not see or hear Prospective Juror H. It is therefore impossible for us to determine the cause of his vagueness and lack of articulation.

The relevant determination here is not whether a prospective juror would always or automatically vote for one penalty or the other; nor is the question strictly whether the individual is unable to follow the law. While either of these circumstances would be a sufficient basis to excuse for cause, neither is a necessary one. Rather, the trial court must endeavor to assess whether "the juror's views would 'prevent *or substantially impair* the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Witt*, *supra*, 469 U.S. at p. 424, fn. omitted & italics added.) In my view, it is entirely reasonable that, in light of the voir dire—including an evaluation of credibility and demeanor—the court could conclude Prospective Juror H.'s view would substantially impair the discharge of his duties. On this record, that assessment is entitled to our deference.

I likewise find no error in the trial court's excusal of Prospective Juror Q. Q. initially indicated she would not automatically vote for one punishment or the other in the event of a penalty phase trial. During subsequent questioning, however, she stated she thought life without the possibility of parole was the more serious alternative. The court and both counsel attempted to clarify her state of mind but without real success. At one point, the prosecution asked,

---

possible, to determine his or her actual views regarding the death penalty. Thus, for example, the court inquired further of several prospective jurors who had indicated on their questionnaires they thought life imprisonment without the possibility of parole was a more severe punishment than death. At some point, the court also explained to the venire generally the manner in which the jury would make its penalty determination, emphasizing that death would be warranted only if the aggravating circumstances substantially outweighed those in mitigation, meaning the law considered death the more severe punishment. Inferentially, the court concluded in this context that it was unnecessary to pursue the point with those prospective jurors it perceived from their demeanor had no confusion on this point.

"Well, can you even conceive of any circumstance under which death would be appropriate?"—to which Q. responded, "I can't think of [any]." The prosecutor made further efforts to understand the logic of her position, which the trial court finally summarized as follows: "I guess what [the prosecutor] is saying is if Hitler were on trial here and he were convicted, he would get life. And if somebody else were tried who just barely made the first degree murder and special circumstances, he'd get death. [¶] . . . [¶] . . . Is that your position?" In response, Q. affirmed without equivocation that the court had accurately described her views on the death penalty.

The trial court properly excused Prospective Juror Q. for cause. As the court expressed the situation, Q. "has boxed herself into a position that where I don't know anymore how she stands. I mean, she is literally impossible at this point to evaluate, absent some lengthy, lengthy questions." The record bears out this determination as well as the reasonable inference Q.'s equivocation and ambivalence would impair her ability to function according to the instructions and her oath if the case proceeded to a penalty phase. Since substantial evidence supports the court's resolution of these uncertainties, we should not second-guess its evaluation of her state of mind.

Defendant argues that nevertheless the trial court erroneously failed to continue questioning Q. to resolve her apparent confusion and clarify her actual views. It is entirely uncertain what, if any, value additional voir dire would have had; and he cites no constitutional imperative for imposing such an obligation where the court and counsel have all made reasonable efforts to ascertain a prospective juror's attitude. As with the ultimate determination to excuse for cause, the trial court's decision whether further questioning would serve any useful purpose should be deferred to on review. (Cf. *Witt, supra,* 469 U.S. at p. 425.)

"The selection of a jury in a capital case includes many judgment calls by trial judges—calls that involve the judge's intuition about the demeanor of the venireman, the appropriateness of his response, his manner, dress, and his inflection. It is a decision with the usual stuff of trial court decisionmaking, calls more dependent upon intuition, shrewdness, or courtroom savvy than abstract analogical processes. Correspondingly, one need not pause for long to summon up myriad examples of expression whose meaning can only be determined by the inflection and manner of its expression. For example, the simple expressions 'I reckon so' and 'I could hardly do so' may or may not express doubt. In sum, ruling upon a request to exclude a venireman inevitably involves an interpretation of what was asked and answered. The dynamic trial scene is not easily conformed to a mold judicially shaped to facilitate review or to achieve a targeted level of accuracy, perhaps because few but lawyers and judges talk and think in such a fashion, peculiarly so

with the interrogation of veniremen in death cases." (*O'Bryan v. Estelle* (5th Cir. 1983) 714 F.2d 365, 393 (conc. opn. of Higginbotham, J.).)

Thus, while preparation is incumbent, the trial court must bring more intuitive skills to the voir dire process as well. Contrary to the majority's implication and irrespective of "careful planning" (maj. opn., *ante*, at p. 966), the actual determination whether to excuse for cause is an on-the-spot assessment of the individual's credibility as a prospective juror, not the parsing of a cold transcription of questions and answers. As the high court reminded in *Witt*, "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." (*Witt*, *supra*, 469 U.S. at p. 424.) Moreover, once error is found, we have no alternative but to reverse the penalty judgment, with the tremendous toll that implies not only on the victim's family but the judicial system at large. Given this consequence, it is all the more critical that we observe the greatest circumspection and take care not to reverse "except in a clear case." (*Reynolds v. United States*, *supra*, 98 U.S. at p. 157.)

Accordingly, I would affirm the judgment in its entirety.

Baxter, J., and Chin, J., concurred.

Respondent's petition for a rehearing was denied October 22, 2003. Brown, J., did not participate therein. Baxter, J., and Chin, J., were of the opinion that the petition should be granted.