Filed 6/23/15  P. v. Martinez CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B258636 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA408603) |
| v. | |
| EMILIO MARTINEZ | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Anne H. Egerton, Judge.  Affirmed.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerard A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Timothy M. Weiner, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Emilio Martinez appeals from a judgment and sentence, following his conviction for second degree murder. He contends the trial court abused its discretion when it admitted two photographs showing the victim's wounds. Finding no reversible error, we affirm.

# PROCEDURAL HISTORY

A jury convicted appellant of second degree murder (Pen. Code, §187, subd. (a)), and found true the allegation that he personally used a deadly weapon (Pen. Code, § 12022, subd. (b)(1)). Appellant was sentenced to 16 years to life in state prison, calculated as an indeterminate term of 15 years to life, plus one year for the weapon enhancement.

# FACTUAL BACKGROUND

A. *Prosecution Case*

Between 2012 and 2013, appellant lived in the garage of a house in the City of Montebello. Reynaldo Vellan and Carmen King lived in the main part of the house. Appellant told his son, Eric Martinez (Eric), that appellant and Ms. King were likely to inherit $800,000 from Vellan, who had suffered a stroke. Appellant also told Eric that King had a gambling habit.

On February 17, 2013, King's daughter, Margarita Delgado, received several telephone calls from her mother. During one of the calls, Delgado heard appellant's voice in the background, saying to King, "I told you that I was a badass," and heard King "crying" and "whimpering." She also heard her mother tell appellant, "I told you I care about you. I care about you."

On February 19, 2013, appellant's son, Adam Martinez (Adam), received a text message from his father that read: "Here's my PIN number to my bank account, the briefcase, and the keys to the Jeep are in the Jeep." That same day,

2

Eric went to the Montebello house to find his father so they could go to Vellan's funeral together. When he arrived, he noticed that King's car was missing, which was "kind of unusual." Eric waited to see if anybody returned to the house, and also called appellant multiple times, but appellant did not answer.

The following day, appellant failed to pick Eric up from school as he usually did. Eric walked to the Montebello house, found a set of keys to the house, and went inside. He discovered King, dead and lying face down on the living room floor. On her back was some paperwork. Eric called the police. He then went to his father's room in the garage to find him, but could not locate him.

City of Montebello Police Officer Adam Rosen responded to Eric's call. Rosen observed a large pool of coagulated blood around King's head, several pieces of paper and a pen on her lower back, and a bloody knife with a six-inch blade next to the body. A trail of blood led from the living room to appellant's room in the garage. A search of the house revealed that the master bedroom appeared to have been ransacked. Rosen spoke with Eric, who stated that appellant was "frustrated with the gambling habits of [King]." Eric also told Officer Rosen that appellant and King had "not been getting along well . . . over money-related issues."

Several days later, appellant called Adam. Appellant told Adam that he and King had argued, that "he [had] blacked out and when he came back to his senses, she was there lying on the floor and he was covered in blood, and he just had to leave and he went down south." Appellant further stated that "the man who passed away had left them money," and that he was "supposed to split it 50/50 with Carmen and that Carmen was going to casinos and blowing the money."

Los Angeles County Senior Criminalist Bonnie Gulley testified that the DNA sample from the knife was a mixture consistent with at least two

contributors.  The DNA profile for the major contributor matched King's DNA profile, and the DNA profile for the minor contributor matched appellant's.

On March 4, 2013, appellant called Los Angeles County Deputy Sheriff Sergeant Howard Cooper.  Appellant told Sergeant Cooper that he was in Mexico, had attempted suicide several times, and now wanted to surrender.  Approximately one hour after contacting Sergeant Cooper, appellant returned to the United States and was taken into custody.

Sergeant Cooper interviewed appellant.  During the interview, appellant stated that he "kind of just lost it" during an argument with King and stabbed her three times in the neck with a butcher knife.  Afterwards, he took King's car, drove to Mexico, and "dumped the car [as] soon as [he] crossed the border."

B.      *Defense Case*

Ryan Manalasan, appellant's employer, testified that on February 4, 2013, appellant sent him a text message stating that appellant was "no longer going to show up for work," but would be doing "hospice" care.  Gerardo Delgadillo, a funeral director, testified he saw appellant together with King when they came to make funeral arrangements for Vellan.  Appellant and King appeared to be "getting along."

## DISCUSSION

Appellant contends he was denied due process when the trial court admitted two crime scene photographs over defense counsel's evidentiary objection.  We disagree.

A.      *Relevant Factual Background*

At a hearing outside the presence of the jury, defense counsel moved, pursuant to Evidence Code section 352, to exclude two photographs (People's

exhibits 23 & 24) as unduly gruesome and prejudicial.[1] Counsel additionally objected to People's exhibit 24 on the ground that it depicted King's body approximately four days after her death "with the decomposition." According to the trial court, the photographs depicted "close-ups of [King's] body." People's exhibit 23 showed "the back of the victim's head, sort of tousled hair, and . . . the shoulders maybe to mid back." It also showed a "fair amount of blood." People's exhibit 24 depicted "the victim facing up from about maybe the hips or thighs up and it again [was] fairly bloody."

The trial court denied defense counsel's motion in limine, ruling that the photographs were "probative of the nature of the crime." The trial court noted that "[s]tabbings are by definition brutal and bloody," and that the prejudicial impact of the photographs did not substantially outweigh their probative value. The trial court further found that People's exhibit 24 did not depict any significant decomposition, and "to me, this [photograph] could have been taken two hours after a homicide as opposed to four days."

B.      *Analysis*

In reviewing a trial court's admission of evidence, we must first determine if the evidence satisfied the relevancy requirement of section 210. Second, if it was relevant, we must determine if the probative value was substantially outweighed by the danger of unfair prejudice under section 352. (*People v. Carter* (2005) 36 Cal.4th 1114, 1166.) "[P]hotographs of murder victims are relevant to help prove how the charged crime occurred, and . . . in presenting the case a prosecutor is not limited to details provided by the testimony of live witnesses." (*People v. Booker* (2011) 51 Cal.4th 141, 170.) "'The admission of photographs of a victim

---

[1]      All further statutory citations are to the Evidence Code, unless otherwise stated.

5

lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]' [Citation.]" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1247-1248; accord, *People v. Scheid* (1997) 16 Cal.4th 1, 18.)

Appellant argues that because he admitted stabbing King, the photographs were not relevant, and the "only purpose in showing the photographs was to inflame the jury." The California Supreme Court recently rejected this same argument: "Defendant argues the photographs were not relevant because, he claims, they did not show anything that he disputed. For example, he admitted he shot the victim while she was lying on the ground. But even so, the prosecution may still prove its case. Defendant cannot prevent the admission of relevant evidence by claiming not to dispute a fact the prosecution is required to prove beyond a reasonable doubt. The jury was entitled to learn that the physical evidence, including photographs, supports the prosecution's theory of the case." (*People v. Rountree* (2013) 56 Cal.4th 823, 852; *People v. Valdez* (2012) 55 Cal.4th 82, 134; see *People v. Wilson* (1992) 3 Cal.4th 926, 938 ["'[W]e have often rejected the argument that photographs of a murder victim should be excluded as cumulative if the facts for which the photographs are offered have been established by testimony'"].) In short, the photographs were highly probative of how the murder occurred.

After carefully reviewing the evidence, the trial court determined that the photographs' probative value was not clearly outweighed by their prejudicial

effect. We discern no abuse of discretion.[2] As the Supreme Court has explained, "'victim photographs and other graphic items of evidence in murder cases always are disturbing. [Citation.]' [Citations.] Here, the photographs portray the results of defendant's violent conduct; that they are graphic and unpleasant to consider does not render the introduction of those images unduly prejudicial." (*People v. Heard* (2003) 31 Cal.4th 946, 976; see also *People v. Riel* (2000) 22 Cal.4th 1153, 1194 ["The fact that the exhibits involved blood was due to the crime, not the court's rulings"].) Likewise, the photographs here portrayed the results of appellant's violent conduct. The trial court reasonably determined that the photographs were admissible over defense counsel's section 352 objection.

Moreover, even had the trial court abused its discretion in admitting the photographs, any error would have been harmless. The jury already had heard testimony from Eric and Officer Rosen describing the murder scene, along with the results of the autopsy. It also had heard appellant's admission that he stabbed King multiple times in the neck. As the Supreme Court has explained in holding admission of crime scene photographs harmless, "[t]he photographs at issue did not disclose to the jury any information that was not presented in detail through the testimony of witnesses. Although the photographs were unpleasant, they were not unusually disturbing or unduly gruesome, and were no more inflammatory than the graphic testimony provided by a number of the prosecution's witnesses." (*People v. Heard*, *supra*, 31 Cal.4th at p. 978.) Finally, nothing about the photographs made it more likely that the jury would convict appellant of second degree murder rather than manslaughter. Indeed, the fact that the jury rejected a first degree murder charge and convicted appellant of second degree murder shows it was not

---

[2]      We, too, have reviewed exhibits 23 and 24.

inflamed by the photographs.  In sum, we find no reversible error in the trial court's admission of the crime scene photographs.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**

MANELLA, J.

We concur:

WILLHITE, Acting P. J.

COLLINS, J.