Filed 8/17/15  P. v. Verkade CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSEPH ROBERTSON VERKADE,<br><br>    Defendant and Appellant. | D064499<br><br><br>(Super. Ct. No. SCN290070) |

APPEAL from a judgment of the Superior Court of San Diego County, Robert J. Kearney, Judge.  Affirmed.

Laura G. Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Elizabeth M. Carino, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Joseph Robertson Verkade (defendant) of the first degree murder of Michael M. Sahagun (Pen. Code, § 187, subd. (a); count 1),[1] attempted robbery (§§ 211, 664; count 2), and burglary (§ 459; count 3). The jury found true the following allegations: in count 1, defendant committed the murder during the course of a burglary (§ 190.2, subd. (a)(17)) and an attempted robbery (*ibid.*); in counts 1, 2 and 3, defendant personally used a firearm (§ 12022.5, subd. (a)); and in counts 1 and 2, defendant personally used a firearm (§ 12022.53, subd. (b)), personally and intentionally discharged a firearm (*id.*, subd. (c)), and personally and intentionally discharged a firearm causing great bodily injury or death (*id.*, subd. (d)). In a bifurcated proceeding following the verdict, defendant admitted the truth of a charged prison prior (§§ 667.5, subd. (b), 668).

On count 1, the trial court sentenced defendant to life in prison without the possibility of parole, plus a consecutive 25 years to life for the section 12022.53, subdivision (d) enhancement, and a consecutive one year for the prison prior. The court stayed the prison terms and enhancements imposed on counts 2 and 3 under section 654.

On appeal, defendant raises two issues: (1) whether the trial court erred in admitting testimony from Heather Strauch regarding her prior use of an electronic benefits transfer (EBT) card;[2] and (2) whether the trial court erred in denying disclosure

---

[1]    Further undesignated statutory references are to the Penal Code.

[2]    One witness who had previously received basic government assistance described an EBT card as "the card that the state gives for food stamps and cash aid." A San Diego County Health and Human Services representative explained that an EBT card works like a bank debit card: The government issues an EBT card to a qualified individual; the government credits a cardholder's "account" with a certain amount of cash based on the

of Strauch's psychiatric records.  Because defendant did not meet his burden of establishing reversible error, we will affirm the judgment.

I.

FACTS

We review the record and recite the facts in a light most favorable to the judgment. (*People v. Hill* (1998) 17 Cal.4th 800, 848-849.)  The murder, attempted robbery and burglary occurred in the early morning hours on April 1, 2011.

A.      *The Parties*

The victim, Sahagun, was a 63-year old resident of Carlsbad at the time of the incident giving rise to the charges in this case.

The original information charged seven defendants with various crimes related to the incident, only six of whom had roles that affect defendant and this appeal.[3]  In late March 2011, three of the original defendants were living together in a residence on Ron Way in San Diego — defendant, his girlfriend Heather Strauch and Michael Gault.[4]

---

applicable benefits; the cardholder can purchase groceries by presenting the EBT card with a sufficient balance to cover the purchase; and the funds are transferred electronically to the retailer and debited from the cardholder's account.

[3]      The seventh defendant, Marilyn March, was charged as an accessory after the fact for harboring, concealing and aiding certain of the defendants after the commission of a felony with the intent that they avoid and escape arrest, trial, conviction and punishment in violation of Penal Code section 32.  The record does not reflect the disposition of this charge.

[4]      Defendant was also known by a nickname, "Joker."  Strauch was also known as Heather Smedley.

3

Immediately before and after the incident, the other three original defendants were living together in room 303 at the Motel 6 in Vista[5] — Mercedes Yorba, Grant Hunter and Jason Breer.[6]  These additional five codefendants were charged in the same three counts as was defendant.

B.    *The Plan*

On March 25, 2011 — six days prior to the events that led to the death of the victim — Hunter called his longtime friend, Sean Meadows, with whom he had consumed narcotics (crystal methamphetamine) in the past.  Unknown to Hunter, Meadows had begun working as a confidential informant for the Bureau of Alcohol, Tobacco and Firearms (ATF).

Hunter explained that he, "a girl named Mercedes" and "another guy" were going to rob an "older" "Mexican" "drug dealer" named "Mike" who lived in Carlsbad, wore eyeglasses and drove a white truck.  According to Hunter, they were going to rob Mike of an ounce of "speed," an ounce of heroin and $2,000 cash.  As Hunter explained, Mercedes was going to order the drugs from Mike, and the three of them (Hunter, Mercedes and the other guy) would go into Mike's garage, where he conducted his

---

[5]    According to some witnesses, the Motel 6 was in Oceanside, and according to others, it was in Vista.  Given the testimonial and documentary evidence, all witnesses and parties were talking about the same Motel 6 at the intersection of College Boulevard and Plaza Drive just south of Highway 78.  Because the identity of the city is irrelevant to any issue on appeal, we will follow the lead of the parties in their appellate briefs and assume without deciding that the Motel 6 was in Vista.

[6]    Breer was also known as Jason Greer.

4

business, to effect the robbery. Hunter was calling to find out whether Meadows knew Mike and whether Meadows knew anyone who would drive them to Mike's.[7]

Meadows reported this information to his ATF handler and, following her suggestion, tried to dissuade Hunter — unsuccessfully.

C.    *Effectuating the Plan*

On the night of March 31, 2011, defendant, Strauch and Gault were asleep in the same room at the Ron Way residence in San Diego;[8] Yorba, Hunter and Breer were together at the Motel 6 in Vista. Around 11:30 p.m., defendant's cell phone awakened Strauch.[9] Yorba was calling, and she explained to Strauch that she (Yorba) had been "shorted on some dope" and that she needed somebody to go with her to get what was owed to her. At that point, Strauch gave the phone to defendant; from what Strauch could hear, defendant "was ready to go," but first had to talk with Gault to see whether he was willing to drive. After defendant assured Gault that Yorba "was cool" and would not "roll on" them, Gault agreed to drive on the additional condition that he was given gas money. Defendant called Yorba, told her they would come and, in discussing the plan,

---

[7]    Meadows did not know Mike.

[8]    All three were "coming down" after "being up [high on methamphetamine] for a few days."

[9]    Although the reporter's transcript of Strauch's testimony indicates the time was approximately 11:15 *a.m.*, from the context of the parties' briefs, the subsequent events in Strauch's testimony, and the evidence from a telephone company representative, the call was placed around after 11:15 *p.m.*; either the deputy district attorney misspoke when he asked the question or the court reporter misreported the question.

asked two or three times whether he needed to bring a weapon. Following that telephone conversation, defendant got out his shotgun and loaded it, explaining to Strauch and Gault that Yorba had not asked him to join her "just to scare somebody." Finally, defendant told Strauch that, "once this was all finished," in exchange for everyone's assistance, there would be plenty of drugs from which everyone could get high.

Shortly before midnight, Gault drove defendant (with his shotgun) and Strauch to the Motel 6 in Vista to pick up Yorba. When they arrived and texted her from the parking lot, Yorba, Hunter and Breer came out of their room and got into Gault's truck. Based on the video surveillance tape from the Motel 6, Gault, defendant and Strauch originally entered the parking lot in Gault's truck at 12:33 a.m. on April 1, 2011, and all six of them left the parking lot in Gault's truck 15 minutes later at 12:48 a.m..

Yorba directed Gault from the Motel 6 in Vista to Sahagun's house in Carlsbad. After completing a drive-by of the house, Gault drove around the block before parking the truck approximately 50 feet away from Sahagun's driveway — in part to be away from a streetlight across from the driveway and in part so that those who were going to back up Yorba would have room to trail behind her. The plan was for Yorba to go in first and talk to Sahagun; while she distracted him, "the boys" (defendant, Hunter and Breer) would enter to provide her protection from harm by Sahagun. Defendant, Hunter and Breer expressly agreed to this plan. Strauch was very clear: based on the discussions on the phone and in Gault's truck, the plan involved *only* "going to get drugs and money" from Sahagun; there was no mention of looking for or taking anything *other than* drugs or money, including specifically Yorba's EBT card.

6

As they left Gault's truck, defendant (with his shotgun), Hunter, Breer and Yorba all wore gloves and hats or hoods. Strauch and Gault, who had remained behind with the truck, lost sight of the others as they walked up Sahagun's driveway. Shortly thereafter, Strauch and Gault heard a "deep . . . boom," after which defendant, Hunter, Breer and Yorba came running toward and entered the truck. Defendant (still holding his shotgun) was smiling and joking; Hunter was "agitated, irritated"; Breer was "agitated"; and Yorba was "[h]ysterical." Defendant explained, as he laughed, that he "just flashed" and shot Sahagun when he saw Sahagun "reach around in the back" as Sahagun said to him, " 'What do you want to do, shoot me, motherfucker?' "

Gault drove back to the Motel 6, arriving around 1:15 a.m. according to the video surveillance tape. Defendant, Hunter, Breer and Yorba got out of the truck in the motel parking lot; there was some discussion about gas money for Gault; and then Hunter, Breer and Yorba returned to their motel room. Gault drove off with defendant and Strauch, and on their way to returning to the Ron Way residence, defendant disposed of the shotgun shell casing in a dumpster at a nearby apartment complex and bought gas for Gault's truck. Over the course of the next few days, defendant cleaned his shotgun and disposed of the hat he was wearing when he shot Sahagun in case it contained spatter from the shooting.

Strauch never saw any drugs or money at any time.

D.    *The Investigation and Arrests*

In response to a 911 call from Sahagun's wife almost immediately after the shooting, officers and paramedics arrived to find Sahagun's dead body in the garage; he

7

had been killed by a single gunshot wound to the chest. Consistent with Hunter's description of the man he and Mercedes intended to rob (Mike), Sahagun was a 63-year-old Hispanic male who lived in Carlsbad, wore eyeglasses and drove a white truck.

Inside the garage on top of a desk next to the body, the authorities found a cellular telephone, a wallet containing $374 in cash and Strauch's EBT card. Controlled substances, drug paraphernalia, cell phones, at least seven knives, a stun gun and prescription eyeglasses were found in various locations in the garage. Sahagun's son later found Yorba's EBT card inside the house on the kitchen counter and turned it over to the Carlsbad police on April 9, 2011.[10]

On April 2, 2011 (the day following the murder), the authorities arrested Hunter and Yorba in room 303 at the Motel 6 in Vista.[11] On April 11, the authorities arrested defendant, Gault and Strauch at the Ron Way residence.[12] There, officers found the shotgun that defendant took with him to Sahagun's residence on April 1.

---

[10]  The parties' stipulation regarding Yorba's EBT card was inconsistent. At one point, they stipulated that Sahagun's son found the card in the kitchen "between April 1st, 2011, and April 19, 2011"; and at another point, they stipulated that he turned over the card "on April 9, 2011." Since he could not have found the card *after* he turned it over, we assume both of the later dates should be either April 9 or April 19. The difference in these dates is not relevant to the issues on appeal.

[11]  The record indicates that a third person, Gary Gomez, was also in the room and arrested at the same time. The People named Gomez as an accessory after the fact in an April 2011 amended complaint and a July 2011 second amended complaint. The parties do not tell us anything further about Gomez.

[12]  The parties do not tell us whether, and if so where, Breer was arrested.

8

E.     *The Trial*

The record in this appeal consists of more than 2,750 pages of reporter's transcript (not including the preliminary hearing) and more than 1,500 pages of clerk's transcript. The trial lasted 20 court days during the time period from May 15 through June 13, 2013. Despite the length of the proceedings below, the two issues defendant raises on appeal are discrete.

1.     *Defendant's Claim-of-Right Defense*

As relevant to the principal issue on appeal, defendant asserted the claim-of-right defense in response to the allegations of attempted robbery and burglary. Although defendant does not state so directly, we understand his position to be that if the judgment is reversed as to the attempted robbery and burglary counts, then his felony-murder conviction must also be reversed.

"The claim-of-right defense provides that a defendant's good faith belief, even if mistakenly held, that he has a right or claim to property he takes from another negates the felonious intent necessary for conviction of theft or robbery." (*People v. Tufunga* (1999) 21 Cal.4th 935, 938.) This defense is codified at section 511:

> "Upon any indictment for embezzlement, it is a sufficient defense that the property was appropriated openly and avowedly, and under a claim of title preferred in good faith, even though such claim is untenable. But this provision does not excuse the unlawful retention of the property of another to offset or pay demands held against him."

Pursuant to this defense, at trial defendant argued that he went to Sahagun's house with Yorba in order to retrieve her EBT card, *not* to rob Sahagun of drugs or money. According to defendant's theory, if he was at Sahagun's house with Yorba to retrieve *her*

9

*property* (the EBT card), as opposed to *Sahagun's property* (drugs or money), then he did not have the requisite intent to take *property of another* — a factual predicate for both attempted robbery and burglary.[13]

The court instructed the jury on defendant's claim-of-right defense based on CALCRIM No. 1863, as follows:

> "An essential element of the crime of robbery, theft, and burglary, where the entry is alleged to have been committed with the intent to commit theft is a specific intent permanently to deprive the alleged victim of his or her property. That specific intent does not exist if the alleged perpetrator had a good faith claim of right to title or ownership of the specific property taken or attempted to be taken from the alleged victim. In other words, if a perpetrator seeks to regain possession of property in which he or she honestly believes he or she has a good faith claim of ownership or title, then he or she does not have the required criminal intent.

> "A good faith belief by a defendant, tried as an accomplice, that he was assisting his co-principal, Mercedes Yorba, retake her property negates the required criminal intent for robbery in violation of Penal Code section 211, theft, and burglary in violation of Penal Code section 459, where it is alleged the entry was to commit theft.

> "The defendant obtained property under a claim of right if he believed in good faith that he or she had a right to the specific property.

> "In deciding whether the defendant believed that he had a right to the property and whether he held that belief in good faith, consider all the facts known to him at the time he obtained the property, along with all the other

---

13     Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Burglary is the entry of "any house, room . . . or other building . . . with intent to commit grand or petit larceny or any felony." (§ 459.) Because "larceny" is read as if it were the word " 'theft' " (§ 490a), "larceny" for purposes of burglary under section 459 requires the intent to deprive the owner of possession of personal property "for an unreasonable time so as to deprive the person of a major portion of its value or enjoyment." (*People v. Avery* (2002) 27 Cal.4th 49, 58 [interpreting § 484, subd. (a) ("theft" defined)].)

10

evidence in the case. The defendant may hold a belief in good faith even if the belief is mistaken or unreasonable. But if the defendant was aware of facts that made the belief completely unreasonable, you may conclude that the belief was not held in good faith.

"The claim-of-right defense does not apply to offset or pay claims against the property owner of an undetermined or disputed amount.

"*The claim-of-right defense does not apply if the claim arose from an activity commonly known to be illegal or known by the defendant to be illegal.*

"If you have a reasonable doubt about whether the defendant had the intent required for robbery in violation of Penal Code section 211, theft or burglary in violation of Penal Code section 459, you must find him not guilty of those crimes." (Italics added.)

In the Discussion, *post*, we will present the evidence at issue on appeal related to the application of the claim-of-right defense.

2. *Subpoenaed Psychiatric Records*

The clerk's minutes and reporter's transcript indicate that defendant subpoenaed Strauch's psychiatric records, they were delivered to the court, and defendant requested the court to review them in camera for potential impeachment purposes. The court reviewed the records in camera, denied defendant's request that he be allowed access to the records and ordered the records sealed.

II.

DISCUSSION

Defendant presents two issues on appeal. Both have to do with Strauch, and neither suggests a basis on which to reverse the judgment.

First, defendant argues that the court erred in overruling his evidentiary objection (based on relevance) to a line of questioning in which Strauch testified that, in the past,

she had traded her EBT card for drugs.  According to defendant, such testimony allowed the prosecutor to improperly imply that, because *Strauch* had previously traded her EBT card for drugs, *Yorba* had traded her EBT card for drugs.

Second, defendant requests that we review Strauch's sealed psychiatric records to determine whether they contain "impeaching or other relevant matter."

A.     *Claim-of-Right Defense*

1.     *Background*

As introduced *ante*, as part of the initial investigation following the homicide, the authorities found Strauch's EBT card on top of a desk next to Sahagun's body in the garage, and more than a week later Sahagun's son turned over to the authorities Yorba's EBT card, which he had found inside Sahagun's house on the kitchen counter.

At trial, during the People's case-in-chief, Strauch testified that she had learned for the first time at the preliminary hearing that her EBT card had been found on Sahagun's desk in his garage next to his body.  She further testified as to her understanding of what an EBT card is[14] and that, at some point in the past, she had sold her EBT card to her "connect."  Following the prosecutor's next question whether Strauch's connect was the person who had provided her with narcotics or controlled substances, the court overruled a relevance objection from defendant's counsel.[15]  Strauch answered "Yes" and — over

---

[14]     According to Strauch, EBT cards are "how they pay out food stamps and cash aid now."

[15]     Defendant also raised this evidentiary ruling in a motion for new trial, which the court denied.

12

defendant's continuing relevance objection — proceeded to describe the process and procedure by which Strauch had traded her EBT card to her connect.[16] Strauch explained that, although usually a person would sell her EBT card for drugs in a one-time transaction in which the balance on the card would be a credit of "50 cents on the dollar" for the value of the drugs received, her dealer gave her a better deal: Strauch gave the dealer her card and her personal identification number, and for each dollar of funds available on the EBT card over the course of a four-month period, the dealer would give Strauch drugs or cash worth 60-70 cents. Strauch understood that such a transaction — and specifically a trade for drugs — was illegal under the government benefits program.[17] Finally, Strauch testified that she did not know how her EBT card ended up in Sahagun's garage, since she did not know Sahagun, had never bought drugs from Sahagun and had never been to Sahagun's house prior to the night of the homicide.

---

[16] Defendant also refers us to a motion in limine in which the court denied his request "to exclude all evidence of Heather Strauch's [EBT] card found in [*sic*] victim's garage as irrelevant under [the People's] theory and Evidence Code [section] 352." On appeal, however, the applicable evidentiary objection and defendant's argument are not directed to the ruling on the in limine motion or, more generally, to the admissibility of Strauch's EBT card. Defendant's trial objection and appellate argument are directed to the relevance of Strauch's testimony of the process by which she had sold her EBT card in the past.

[17] A San Diego County Health and Human Services representative who deals with EBT cards confirmed that some EBT card beneficiaries trade their EBT cards (along with their personal identification numbers) for controlled substances. The representative further explained that each potential beneficiary is told, orally and in writing, that if she is found guilty of trading her EBT card for controlled substances, she will lose her benefits.

13

As defendant explains on appeal, his objection to this line of questioning is that, based on this testimony, the People improperly "insinuated" that, because Strauch previously had sold her EBT card for drugs in an illegal transaction, Yorba as well must have sold her EBT card for drugs in an illegal transaction (as opposed to losing it or having it stolen). The significance of the illegality of the transaction is that the claim-of-right defense is unavailable as a matter of law where the belief of the right to the property "is rooted in a notoriously illegal transaction." (*People v. Gates* (1987) 43 Cal.3d 1168, 1182.) In this regard, the court properly instructed the jury in part as follows based on CALCRIM No. 1863: "The claim-of-right defense does not apply if the claim arose from an activity commonly known to be illegal or known by the defendant to be illegal."

2.    *Law*

Only relevant evidence is admissible (Evid. Code, § 350), "and all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute. (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d).)" (*People v. Heard* (2003) 31 Cal.4th 946, 973 (*Heard*).) Relevant evidence is that which has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Relevance is established when the evidence tends " ' " 'logically, naturally, and by reasonable inference' " ' " to establish a material fact. (*Heard*, at p. 973.)

A trial court's admission of evidence is reviewed for an abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 547.) Under this standard, the trial court's ruling will not be disturbed in the absence of a showing that the court exercised its

14

discretion "in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

3.      *Analysis*

In this appeal, we are reviewing the court's ruling that allowed into evidence Strauch's testimony of her prior sale of her EBT card for drugs. Defendant describes the issue on appeal to be "whether Heather Strauch's use of her EBT card tends to prove Mercedes Yorba's use of her EBT card." Arguing that "evidence of Strauch's [past] behavior has no bearing on Yorba's behavior on another occasion," defendant contends that Strauch's testimony was irrelevant and the court erred in admitting it. We disagree.

The People were entitled to attempt to establish that Yorba's EBT card was at Sahagun's residence as a result of an illegal transaction, thereby defeating defendant's claim-of-right defense. To this end, Strauch's testimony was strong circumstantial evidence that Sahagun accepted EBT cards in trade for drugs, an illegal transaction. Thus, contrary to defendant's argument, the relevance of Strauch's testimony was not to suggest that, because Strauch traded her EBT card for drugs, so did Yorba; the relevance was to suggest that EBT cards are used as currency in illegal drug transactions. From there, given the evidence that *two* EBT cards were found on Sahagun's property — one (Strauch's) on Sahagun's desk next to his body near evidence of drug transactions, and one (Yorba's) in his kitchen — the jury reasonably could have found that Sahagun, a drug dealer, accepted EBT cards as currency in his drug transactions. The jury then could

15

reasonably infer that Sahagun had received *Yorba's EBT card* as part of such an illegal transaction, thereby defeating defendant's claim-of-right defense as a matter of law.[18]

In a related argument, defendant contends that, because Strauch testified that she did not know Sahagun and had never been to his house prior to the night of the homicide, her testimony regarding what she had done with her EBT card was not relevant to establish whether Sahagun accepted EBT cards in exchange for illegal drugs. To the contrary, given that Strauch's EBT card was found on Sahagun's desk next to his body along with weapons, cash and drugs nearby, the testimony that Strauch did not know Sahagun and had never been to his house is even stronger evidence — and thus relevant to proving — that EBT cards are used as currency in the sale of illegal drugs. The fact that Strauch's EBT card traveled through the chain of illegal drug commerce — from Strauch to her "connect," a drug dealer known to Strauch, and eventually to Sahagun, a drug dealer not known to Strauch, months later — tends to " ' " 'logically, naturally, and by reasonable inference' " ' " establish the material fact that EBT cards are used as drug currency. (*Heard*, *supra*, 31 Cal.4th at p. 973.) Thus, this evidence relating to *Strauch's EBT card* "tend[s] in reason to prove" (Evid. Code, § 210) the disputed fact whether Sahagun was in possession of *Yorba's EBT card* as a result of "an activity commonly

---

18    We note that there is no indication that the jury disbelieved the claim-of-right defense on the basis that Yorba's EBT card was involved in illegal activity. Once again, the uncontradicted evidence was that defendant went to Carlsbad to rob "Mike" of drugs and money, and there was no evidence that defendant went to Carlsbad to retrieve Yorba's EBT card.

16

known to be illegal or known by the defendant to be illegal" (CALCRIM No. 1863). As such, the evidence related to Strauch's EBT was relevant.

Accordingly, the trial court did not abuse its discretion in overruling defendant's relevance objections to questions that called for Strauch to testify regarding her prior use of her EBT card.

4.    *Harmless Error*

In any event, even if we assume the trial court erred in admitting Strauch's testimony, we may reverse the judgment only if the error "resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b); see Code Civ. Proc., § 475.) We apply the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818 to determine whether the erroneous admission of irrelevant evidence resulted in a miscarriage of justice that requires reversal. (*Id.* at pp. 832, 836.) Under this standard, such error is reversible only when the appellant meets his burden of establishing a reasonable probability that he would have received a more favorable result had the evidence been excluded. (*Id.* at p. 836.) For purposes of this analysis, a "reasonable probability" is one sufficient to undermine the confidence in the convictions. (*Strickland v. Washington* (1984) 466 U.S. 668, 694.)

Very simply, the overwhelming *uncontradicted* evidence was that the *only* reason defendant went to Carlsbad in the early hours of April 1, 2011, was to rob Sahagun of drugs and money; there was *no* evidence that defendant (or any of the others) intended to retrieve Yorba's EBT card (or any property belonging to anyone other than Sahagun).

17

Six days prior to the events that led to Sahagun's death, Hunter told an ATF agent that he, "a girl named Mercedes" and "another guy" were going to rob an "older" "Mexican" "drug dealer" named "Mike" who lived in Carlsbad, wore eyeglasses and drove a white truck. They were going to rob him of an ounce of "speed," an ounce of heroin and $2,000 cash. Mercedes was going to order the drugs from Mike, and the Hunter, Mercedes and the other guy would go into Mike's garage, where he conducted his business, to rob him of an ounce of speed, an ounce of heroin and $2,000 cash. At this point in time, they were looking for someone who would drive them to Mike's.

On the night of March 31. 2011, defendant, Strauch and Gault were asleep in the same room at the Ron Way residence in San Diego; and Yorba, Hunter and Breer were together at the Motel 6 in Vista. In a very late night telephone conversation, Yorba told Strauch that she (Yorba) had been "shorted on some dope" and that she needed somebody to go with her to get what was owed to her. Strauch gave the phone to defendant, who said he "was ready to go," but first would have to find transportation. After arranging for Gault to drive, defendant called Yorba, told her they would come and, in discussing the plan, asked two or three times whether he needed to bring a weapon. Defendant then got out and loaded his shotgun, explaining to Strauch and Gault that Yorba had not asked him to join her "just to scare somebody." Finally, defendant told Strauch that, "once this was all finished," in exchange for everyone's assistance, there would be plenty of drugs from which everyone could get high.

Shortly before midnight, Gault drove defendant (with his shotgun) and Strauch to the Motel 6 in Vista, where they picked up Yorba, Hunter and Breer. Yorba directed

18

them from the Motel 6 in Vista to Sahagun's house in Carlsbad. The plan — to which defendant agreed — was for Yorba go in first and talk to Sahagun; while she distracted him, defendant (and Hunter and Breer) would enter to provide her protection from harm by Sahagun.

As they entered Sahagun's garage, defendant (with his shotgun), Hunter, Breer and Yorba all wore gloves and hats or hoods. When they returned to Gault's truck, defendant (still holding his shotgun) was smiling and joking, as he explained that he "just flashed" and shot Sahagun when he saw Sahagun "reach around in the back" and say to him, " 'What do you want to do, shoot me, motherfucker?' " Gault drove back to the Motel 6, dropped off Hunter, Breer and Yorba around 1:15 a.m. and then returned with defendant and Strauch to the Ron Way residence.

Based on the telephone conversations and the discussions in Gault's truck while driving to Vista and then to Carlsbad, the plan involved *only* "going to get drugs and money" from Sahagun; there was no mention of looking for or taking anything *other than* drugs or money, including specifically Yorba's EBT card. After the shooting, as before, there was no evidence of *any* intent to have been looking for any property not belonging to Sahagun.

Finally, in direct response to defendant's claim-of-right defense, the People presented evidence strongly suggesting that Yorba's EBT card had not been lost or stolen; i.e., evidence that Yorba did not need three men (wearing gloves and hats or hoods) and a shotgun to retrieve her lost or stolen EBT card at 1:00 a.m. in the morning. From a San Diego County Health and Human Services representative and a Carlsbad police officer,

19

the jury learned: individuals who receive EBT cards are told to report lost or stolen EBT cards either to their case worker or to a 24-hour toll-free telephone number in order to protect the funds credited to a specific card; individuals who receive EBT cards are given written instruction to this effect; and at the time she was arrested, Yorba had a copy of these written instructions in her backpack.

Defendant contends that the evidence of a plan to rob Sahagun, as opposed to retrieve Yorba's EBT card, "was not overwhelming." We disagree, as we explained *ante*. The few examples of cross-examination testimony in which defendant's trial attorney was able to establish that certain witnesses may have testified differently on prior occasions do not persuade us that there is a reasonable probability that, without the admission of Strauch's testimony regarding her EBT card, defendant would have received a more favorable outcome. Likewise, defendant's proposition that the jury "likely . . . disregarded" Hunter's testimony is speculative. Finally, defendant's suggestion that jury's inquiry "whether lesser included offenses to murder could be considered for felony murder" cast "some doubt regarding the robbery and burglary felony murder theories" has no basis on this record. The jury's actual inquiry included a number of questions and reads in full:

> "We need clarification on a few things: What is the difference between first and second degree murder?
>
> "[CALCRIM No.] 540A — Felony Murder: On this theory is it murder in the first degree?
>
> "Are there any special circumstances that need to be further considered?

"Is second degree and manslaughter a choice when felony murder is on the table?"

The court responded in writing as follows:

> "Felony Murder as stated in CALCRIM instruction 540A is a theory of first degree murder. The offenses of 2nd degree murder and voluntary manslaughter are not applicable to the Felony Murder theory.
>
> "A second theory of murder is murder with Malice Aforethought. Second degree murder under the theory of Malice Aforethought is defined in CALCRIM 520. First degree murder under the theory of Malice Aforethought is defined in CALCRIM 521. As to the difference between First and Second Degree murder, I would direct your attention to CALCRIMS 520 and 521. . . .
>
> "The Court cannot accept a verdict for Second Degree murder or Voluntary Manslaughter for Count One unless the jury finds [defendant] not guilty of First Degree Murder. . . .
>
> "If you find [defendant] not guilty of First Degree Murder for Count One, then you do not have to further consider the special circumstances alleged pursuant to Penal Code sections 190.2(A)(17). If you find [defendant] guilty of First degree Murder in Count One, then you need to further consider the special circumstances for Count One. . . ."

Contrary to defendant's contention, neither the questions nor the responses cast juror doubt regarding defendant's guilt of the attempted robbery or burglary based on the claim-of-right defense or otherwise.

For the foregoing reasons, defendant did not meet his burden of establishing a reasonable probability that he would have received a more favorable result had Strauch's testimony regarding her EBT card been excluded. Accordingly, any error potentially associated with overruling the relevance objection to Strauch's testimony is harmless.

21

B.      *Subpoenaed Psychiatric Records*

1.      *Background*

At a pretrial status conference on March 14, 2013, defendant's counsel advised the court that he had subpoenaed Strauch's psychiatric records, which the clerk noted had been received by the court almost four months earlier in November 2012. Counsel asked the court to review Strauch's records "to see if there's any [] material in there that I would be entitled to use to impeach her." The court set a hearing for March 19, 2013.

At the March 19 hearing, defendant's counsel's offer of proof was his "expectation" that Strauch would be "an integral percipient witness" for the prosecution, "as she was one of the party of six that drove over to the residence where th[e incident] occurred, and then drove away with them after the incident occurred." Counsel then repeated his request that the court review Strauch's psychiatric records in camera and provide him "with any information with which I might be able to impeach her." The court and counsel further discussed the scope of Strauch's anticipated testimony, and in response to the court's question for guidance on what to look for in the psychiatric records, counsel stated that he wanted "everything that would have to do with Evidence Code section 780,"[19] as well as *all* of her "psychological conditions" so that an expert

_____

19      Evidence Code section 780 provides generally that "the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing" and in 11 subdivisions contains a nonexclusive list of such matters, including demeanor, attitude, character for honesty (or dishonesty), existence (or nonexistence) of bias, prior consistent (or inconsistent) statements, et cetera.

can review them to determine whether they might be used for impeachment. Without argument, the People submitted on defendant's request for an in camera review. Strauch's attorney was not present at either hearing.

The court acknowledged that such a motion should be made *during* the trial, as opposed to *before* the trial, but agreed with defendant's counsel's suggestion to conduct the in camera review at that time in order to avoid a potential delay during the trial. The court continued the hearing until the next day.

Meanwhile, the court examined the psychiatric records and issued oral findings in camera. The court ordered that any transcription of the in camera findings be sealed. At the continued hearing on March 20, 2013, with defendant, his attorney and the prosecutor present, the court ruled that the subpoenaed psychiatric records did not contain "any evidence of the kind being sought to be turned over" and ordered the records sealed.

Trial began more than two months later on May 21, 2013, and Strauch testified on May 28 and 29, 2013. Defendant did not renew his motion during trial.

2.    *Law*

The mental illness or emotional instability of a witness can be the subject of cross-examination of the witness "if such illness affects the witness's ability to perceive, recall or describe the events in question." (*People v. Gurule* (2002) 28 Cal.4th 557, 592 (*Gurule*).)[20] When a criminal defendant seeks the disclosure of privileged psychiatric

_____

[20]    We will assume, without deciding, that defendant's counsel's oral explanation in the trial court was sufficient to establish the good cause necessary for the initial discovery

23

information of a critical prosecution witness for purposes of impeachment, the trial court must "balance the defendant's need for cross-examination and the state policies the privilege is intended to serve" — as required by *Davis v. Alaska* (1974) 415 U.S. 308, 319 (*Davis*) (state statute protected anonymity of juvenile offenders) when a defendant's right to confront adverse witnesses requires information protected by state law evidentiary privileges. (*People v. Hammon* (1997) 15 Cal.4th 1117, 1127 (*Hammon*).) Here, the documents that defendant subpoenaed are protected from discovery by the psychotherapist-patient privilege. (Evid. Code, § 1014.)

When such documents are subpoenaed, as in the present case, an in camera hearing may be required to determine whether the defendant's need for the information outweighs the third-party's interest in confidentiality. (*Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 60 [state statute providing for confidentiality of investigative files concerning child abuse]; see Pen. Code, § 1326, subd. (c) ["court may order an in camera hearing to determine whether or not the defense is entitled to receive the documents"].) *Hammon* is quite clear, however. This in camera review is to occur, if at all, *at trial* — not during pretrial proceedings:

> "Before trial, the court typically will not have sufficient information to conduct this inquiry; hence, if pretrial disclosure is permitted, a serious risk arises that privileged material will be disclosed unnecessarily. [¶] . . . [¶] [W]e decline to extend the defendant's Sixth Amendment rights of confrontation and cross-examination to authorize pretrial disclosure of privileged information. Of course, nothing we say here is intended to

of Strauch's psychiatric records. (See *People v. Reber* (1986) 177 Cal.App.3d 523, 531, disapproved on other grounds in *Hammon*, *supra*, 15 Cal.4th at p. 1123.)

address the application *at trial* of the principles articulated in *Davis*, *supra*, 415 U.S. 308." (*Hammon*, *supra*, 15 Cal.4th at pp. 1127-1128.)

As our high court later confirmed, "[u]nder *Hammon*, *supra*, 15 Cal.4th 1117, psychiatric material is generally undiscoverable *prior to trial*." (*Gurule*, *supra*, 28 Cal.4th at p. 592, italics added.)

A respected treatise explains that the court should wait until trial in order to "consider the prosecution evidence, the proffered defense as presented in opening statements, cross-examination of the prosecution's witnesses, and any other evidence relevant to" balancing a defendant's right to cross-examination against the state's policies that the privilege is intended to serve. (Cal. Criminal Law: Procedure and Practice (Cont. Ed. Bar 2014) § 1129, p. 276.) Otherwise, prior to knowing how the trial will proceed, even an in camera pretrial disclosure risks "not only a serious, but an *unnecessary*, invasion of the patient's statutory privilege (Evid. Code, § 1014) and constitutional right of privacy (Cal. Const., art. I, § 1; see *People v. Stritzinger* (1983) 34 Cal.3d 505, 511-512 [recognizing the psychotherapist-patient privilege as an aspect of the privacy right])." (*Hammon*, *supra*, 15 Cal.4th at p. 1127.)

3.      *Analysis*

Initially, under *Hammon*, we question the timing of the trial court's in camera inspection — more than two months prior to Strauch's testimony. As suggested in *Hammon*, at this stage of the proceedings, the court here could not have had sufficient

information to conduct this inquiry.[21] (*Hammon*, *supra*, 15 Cal.4th at p. 1127.) Because defendant did not renew his request during the trial, the trial court did not determine, *based on Strauch's testimony*, how the information in the subpoenaed documents might reflect on "the witness's ability to perceive, recall or describe the events in question." (*Gurule*, *supra*, 28 Cal.4th at p. 592.) While we might deem this failure a forfeiture of the right to appellate review, because of the importance of the issue, we will independently review the subpoenaed documents[22] — with the benefit of a complete transcript of the trial, including specifically Strauch's testimony.[23] (See *Gurule*, at p. 595 [Supreme Court reviewed partially-withheld psychiatric records even after having concluded that any error in failing to disclose them was harmless].)

Having studied Strauch's testimony and having fully reviewed the sealed psychiatric records, we conclude that the trial court's ruling is not erroneous. The records do not contain information that suggests a mental illness or instability that would have affected Strauch's "ability to perceive, recall or describe the events in question." (*Gurule*,

[21]    Indeed, the court here even recognized *Hammon*'s directive to wait until the trial, but at defendant's counsel's suggestion that a pretrial ruling could avoid a delay during the trial, the court conducted the in camera inspection and issued its ruling months in advance of trial.

[22]    As a general rule, we review the denial of a motion for pretrial discovery of psychiatric records for an abuse of discretion. (*Lemelle v. Superior Court* (1978) 77 Cal.App.3d 148, 154-155, 156 [psychiatric and psychological records of third-party police officers].)

[23]    We acknowledge that our review necessarily excludes the consideration of Strauch's demeanor or other physical effects during the testimony. By not having asked the trial court to rule on the discovery request during trial in the first instance, however, defendant has forfeited this consideration.

*supra*, 28 Cal.4th at p. 592.)  Stated differently, Strauch's psychological records contain no information the release of which was potentially essential to confront Strauch in order to ensure defendant's constitutional right to a fair trial.  (See *Hammon*, *supra*, 15 Cal.4th at p. 1127.)

## DISPOSITION

The judgment is affirmed.


IRION, J.

WE CONCUR:


McCONNELL, P. J.


McINTYRE, J.